THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EARL ALLEN, Defendant-Appellant.

First District (2nd Division)    No. 80-266

Opinion filed May 26, 1981.

Ralph Ruebner and Michael Mulder, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Richard F. Burke, and Dean C. Morask, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Defendant, Earl Allen, was charged by indictment with the murders of Geraldine Hubbard and her 16-year-old brother, Willie Hubbard. Following a jury trial defendant was found guilty of both counts of murder and sentenced to serve two concurrent terms of not less than 100 nor more than 300 years. Defendant appeals contending: (1) that he was denied his constitutional rights to an impartial jury where the State exercised its peremptory challenges to exclude blacks and Latinos from

the jury; and (2) that he was prejudiced by the prosecutor's comment during closing argument.

Victim Geraldine Hubbard and defendant, her boyfriend, had resided together for approximately one year prior to January 10, 1978, in apartment 606 at 1111 West Roosevelt Road. During the evening hours of January 9, 1978, victim Willie Hubbard, defendant, Sylvester Adams, and Calvin Carter, the boyfriend of Geraldine's sister, Emma Hubbard, were present at apartment 606. At approximately 8:30 p.m. defendant "slapped" Willie, claiming that Willie owed him $70 or $75. Willie began crying and denied having defendant's money. When Geraldine returned home at approximately 9 p.m., Willie was still crying and defendant confronted her with the allegation that "somebody [had] beat him out [of] his money." Geraldine replied that "it couldn't have been her brother" and called the police.

At approximately 8:30 p.m., Thomas Newton, a Chicago policeman, received a radio assignment and proceeded to apartment 606. When he entered the apartment, Willie was crying and defendant appeared to be very upset. Defendant stated that Willie owed him money. After Officer Newton spoke with Geraldine, he told defendant to gather his belongings and leave the apartment. Defendant complied with the officer's command.

On January 10, 1978, Felissicia Hubbard[1] lived with her mother, Emma Hubbard, and Calvin Carter in apartment 1508 at 1111 West Roosevelt Road. At approximately 5 p.m., Felissicia and a friend left the day-care facility and went to Felissicia's apartment to request permission to go to the friend's apartment on the fourth floor. After receiving permission, they proceeded to walk down the stairs to the fourth floor because the elevator "didn't come." As they were walking down the stairs, someone on the eighth floor called to Felissicia's friend and she "went to see what they wanted." As Felissicia walked down to the seventh floor, she saw Wendall Allen[2] and a man named Vincent, who was holding a black gun, standing outside of apartment 709. Sylvester Adams was standing by the ramp near the stairway shaking his head. Felissicia then observed defendant, who was crying, run up the stairs to the seventh floor. Defendant approached Vincent and, while Vincent held the gun, defendant loaded five bullets into the weapon. Felissicia was standing approximately 10 feet away from the defendant. She then continued walking down the stairs to the fourth floor.

At approximately 5:45 p.m., Emma Hubbard received a telephone call from her friend Velma Taylor. Immediately following their conver-

---

[1] Felissicia, age nine, qualified as a witness.

[2] The presentence record indicates that defendant has a brother named Wendall Allen, but Felissicia's testimony does not indicate that Wendall Allen is defendant's brother.

sation, Emma asked Calvin Carter to go to Geraldine's apartment. Emma called her mother, dressed, and left her apartment to go to Geraldine's apartment. As she left her apartment, Emma saw defendant and Sylvester Adams exit the elevator and walk to the stairs leading to the 16th floor.[3] Defendant asked Emma "what was happening," but Emma did not respond.

When Carter entered Geraldine's apartment, he saw Geraldine lying on her side on the floor approximately five or six inches from the door. Although there was blood all over Geraldine's shirt, Carter did not see any blood on the floor. When Carter asked her "who did it," she replied that "Earl Allen shot me and Main." Main was Willie's nickname. Geraldine did not say anything else to Carter while he was in the apartment and he did not ask her any other questions. Carter was the only person in the apartment at this time. Carter walked over to Willie, who was lying on the couch, and observed that he had "two holes in his head with blood running down." Almost immediately thereafter approximately six or seven police officers arrived at the apartment.

Officer Newton was the first police officer to arrive at Geraldine's apartment, and, as he entered the apartment, he saw Geraldine lying on the floor, apparently shot in the back of the neck, and saw Willie lying on the couch with two gunshot wounds in the right side of his head. Willie appeared to be dead, but Geraldine was still alive. Calvin Carter was also present in the apartment when Officer Newton arrived. Officer Newton went into the various rooms of the apartment and, while in the bedroom, observed blood on the bedspread near the head of the bed.

Approximately one minute after Officer Newton entered the apartment, Officer Robert Kocan and other police personnel arrived. When Officer Kocan entered the apartment, Officer Newton was in one of the bedrooms. Officer Kocan stepped over the body of Geraldine and said aloud, "I wonder who did this." Geraldine opened her eyes, lifted her head slightly and responded, "Earl Allen did it." Officer Kocan informed Officer Newton and his fellow officers, and then "sent out a flash message over the radio." Officer Kocan did not question Geraldine nor did she make any further statement. Officer Newton did not hear Geraldine say anything.

Emma arrived at Geraldine's apartment approximately three or four minutes after Carter. When she entered the apartment, she saw Geraldine lying on the floor and Willie lying on the couch. Willie was not moving and had "holes in his face." There was a number of police officers in the apartment and some of these officers picked Geraldine up, placed her on a chair and took her out of the apartment. As the officers carried Geraldine to the elevator, Emma pulled Geraldine's arm and asked, "Who

---

[3] Emma testified that defendant had a girlfriend named Tiny who lived in apartment 1607.

did this to you?" Geraldine replied, "Earl Allen did this to me." Emma again questioned Geraldine, "Who did this to you?" and Geraldine again responded, "Earl Allen did this to me and Willie." Geraldine was then placed in the elevator. After Willie was taken out of the apartment, Emma walked through the apartment but did not touch anything. She observed blood on the bedsheets of Geraldine's bed. As Officer Newton was leaving the apartment, he was "confronted" by Emma and they conversed. As Emma was leaving the building, Geraldine was being placed in the squadrol, and Emma again asked her what had happened. Emma and Calvin Carter then accompanied the police to headquarters where they spoke with Investigator Griffin. During Griffin's conversation with Emma, she told him of her conversation with Geraldine in the sixth floor hallway.

Pursuant to his conversation with Emma, Officer Newton proceeded to apartment 709 where defendant's mother lived. Following a conversation with defendant's mother, Officer Newton proceeded to apartment 1507 where he arrested defendant. At the time of his arrest, defendant did not have any weapon or ammunition on his person, nor did the officers find these items in apartments 709 or 1507.

Dr. Lee F. Beamer, a Cook County medical examiner, performed the autopsy on both Willie and Geraldine. The autopsy of Willie revealed two gunshot wounds to the head. Dr. Beamer concluded that the wounds would have caused Willie to become unconscious immediately and die shortly thereafter. The autopsy of Geraldine revealed a bullet wound located in the back of the head at the "junction of the head and neck." Dr. Beamer concluded that because Geraldine was not shot in the volitional or thinking part of the brain, she could have regained consciousness after she was shot. Dr. Beamer further concluded that Geraldine could have talked coherently and moved from the bedroom to the livingroom despite the wound she had suffered.

John Sadunas, a Chicago Police Department firearms examiner, analyzed the bullets recovered from the bodies of Willie and Geraldine. His analysis revealed that all the bullets were fired from the same type of weapon, a .38 Smith and Wesson revolver.

I

Defendant, a black, first contends that he was denied his right to a trial by an impartial jury as guaranteed by article I, sections 2, 8 and 13 of the Illinois Constitution and by the sixth and fourteenth amendments to the United States Constitution because the State exercised its peremptory challenges to exclude from jury service all of the black and Latino prospective jurors. Both the State and the defendant exercised 16 peremp-

tory challenges. Of the 16 peremptory challenges exercised by the State, seven of the prospective jurors excused were white, seven were black, and two were Latino. One of the black prospective jurors excused was Ms. Fowler, who, when questioned whether reaching a verdict would present a problem for her, replied, "Maybe it would, maybe it would. I really couldn't say." One Latino prospective juror who was excused, Ms. Crunena, revealed in chambers that her son had been convicted of a misdemeanor involving the use of a gun and had served two weeks in the Illinois House of Corrections. Two of the prospective jurors who were excused, Ms. Maltese, a white, and Ms. Palmer, a black, both worked in the criminal court system while they were students in college. In addition, Mr. McCarren, a white, who was taking law courses at Vanderbilt University, was also excused. The State also exercised one peremptory challenge to excuse Mr. Johnson, a black, from service as an alternate juror. Mr. Johnson had never been in the military, and of the eight men who served on the jury at least six had been in the military. After the jurors and alternates had been selected, defense counsel moved to discharge the jury, arguing that the "State's use of peremptory challenges undercut [defendant's] right to an impartial jury selected from a cross-section of the community by systematically excluding minorities from the petit jury." The trial court denied defendant's motion.

In *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, defendant argued that he was denied equal protection of the law by discrimination in the selection of jurors from the veniremen, demonstrated by the fact that the prosecutor exercised his peremptory challenges to remove all blacks from the jury panel. The United States Supreme Court held that where there is no showing of a systematic pattern, over time, of the exclusion of a particular racial group from sitting on juries, a prosecutor's motives may not be inquired into when he excludes members of that group from sitting on a particular case by the use of peremptory challenges. The court stated:

> "In light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think,

would establish a rule wholly at odds with the peremptory challenge system as we know it. \* \* \*." 380 U.S. 202, 222, 13 L. Ed. 2d 759, 773-74, 85 S. Ct. 824, 837.

The Illinois courts have repeatedly expressed agreement with *Swain*. (See *People v. King* (1973), 54 Ill. 2d 291, 296 N.E.2d 731; *People v. Butler* (1970), 46 Ill. 2d 162, 263 N.E.2d 89; *People v. Attaway* (1976), 41 Ill. App. 3d 837, 354 N.E.2d 448; *People v. Thornhill* (1975), 31 Ill. App. 3d 779, 333 N.E.2d 8.) Even prior to *Swain*, our supreme court in *People v. Harris* (1959), 17 Ill. 2d 446, 161 N.E.2d 809, *cert. denied* (1960), 362 U.S. 928, 4 L. Ed. 2d 747, 80 S. Ct. 755, commented upon the use of peremptory challenges to exclude prospective jurors on the basis of race. In *Harris*, the defendant contended that he was deprived of both due process and equal protection because the State exercised its peremptory challenges so as to "systematically" exclude blacks. The court concluded, at page 451:

"The fact that the State's exercise of peremptory challenges resulted in excluding [blacks] from the petit jury did not deprive defendant of *any* constitutional right. [Citation.] The right of peremptory challenge is a substantial one which should not be abridged or denied. It may, by its very nature, be exercised or not exercised, according to the judgment, will or caprice of the party entitled thereto, and he is not required to assign any reason therefor. [Citation.]" (Emphasis added.)

Identical contentions were made by the defendants in both *Thornhill* and *Attaway*. Both cases relied upon *Harris* and found that because peremptory challenges may be exercised without explanation or without being subject to control by the court, it could not be said that the State exercised its peremptory challenges improperly.

Although defendant alleges that the prosecution's actions constituted a violation of the fourteenth amendment, it is clear that he has failed to establish the kind of systematic exclusion required by *Swain*. Recognizing this, defendant argues that *Swain* "needs to be reexamined in view of recent case law to the contrary," and urges us to adopt the reasoning of the California Supreme Court in *People v. Wheeler* (1978), 22 Cal. 3d 258, 583 P.2d 748, 148 Cal. Rptr. 890. The *Wheeler* court, relying on the California Constitution, held that the State's use of peremptory challenges based solely on group affiliation violated the defendant's right to a fair and impartial jury drawn from a representative cross-section of the community. *Wheeler*, like *Swain*, begins with the presumption that the State is exercising its peremptory challenges on constitutionally permissible grounds. However, *Wheeler* allows a defendant to rebut this presumption

upon a lesser showing than that mandated by *Swain*. Under *Wheeler*, the defendant must establish the following three requirements:

"First * * * he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather then because of any specific bias." (22 Cal. 3d 258, 280, 583 P.2d 748, 764, 148 Cal. Rptr. 890, 905.)

By way of illustration, the *Wheeler* court discussed the type of evidence which would be helpful to the defendant in establishing a *prima facie* case of discrimination.

" * * * [T]he party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory *voire dire*, or indeed to ask them any questions at all. Lastly, * * * the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention." 22 Cal. 3d 258, 280-81, 583 P.2d 748, 764, 148 Cal. Rptr. 890, 905-06.

Once this showing has been made, it becomes incumbent upon the trial court to determine whether a reasonable inference arises that the State is exercising its peremptory challenges on the basis of group affiliation alone. If the court finds that this inference exists, the burden shifts to the State to show that it exercised its peremptory challenges on grounds reasonably related to the particular trial or its parties or witnesses.

In considering this issue, we are aware of the controversy which exists in this court concerning the merit of the *Wheeler* rationale. Compare *People v. Fleming* (1980), 91 Ill. App. 3d 99, 413 N.E.2d 1330 (where the court refused to apply the *Wheeler* decision, criticizing it as vague and uncertain) with *People v. Smith* (1980), 91 Ill. App. 3d 523, 414 N.E.2d 1117 (where the court indicated that it would not hesitate to adopt

*Wheeler* in a proper case) with *People v. Bracey* (1981), 93 Ill. App. 3d 864, 1029 N.E.2d 202 (where the court indicated that the case before it was not a proper case in which to decide whether the *Wheeler* rationale should be adopted in Illinois because the defendant had failed to establish a *prima facie* case of discrimination under the *Wheeler* standards).

This court in *People v. Fleming* expressed its misgivings concerning the *Wheeler* standard, stating:

> "We agree with the Wisconsin Court of Appeals that 'the test proposed by the California court is vague and uncertain, and severely limits the scope of peremptory challenges. If peremptory strikes can only be exercised in a certain way, dependent on circumstances, and subject to judicial scrutiny, they will no longer be peremptory. We refuse to undertake such an alteration of the very nature of the peremptory system.' *State v. Grady* (1979), 93 Wisc. 2d 1, 13, 286 N.W.2d 607, 612." (91 Ill. App. 3d 99, 105.)

This court does not condone the use of peremptory challenges to exclude prospective jurors on the basis of race. However, the adoption of the *Wheeler* test by this court at this time would significantly alter the nature of the long-established peremptory system as well as contravene the prevailing case law.

■■ We also, as in *Fleming*, reject defendant's contention that the State's exercise of its peremptory challenges violated defendant's right to an impartial jury guaranteed by the sixth amendment to the United States Constitution and article I, section 8, of the Illinois Constitution.

II

Defendant also contends that he was prejudiced by the prosecutor's comment during closing argument. In support thereof, he argues that the comment created an "inference" of prior criminal conduct.

During Officer Newton's testimony at trial, he was asked if he could identify defendant, and he pointed to defendant. The prosecutor then asked, "How many years have you known Earl Allen?" Officer Newton responded, "Approximately ten years." Defense counsel objected and the court struck the testimony, instructing the jury to disregard it. The prosecutor then asked Officer Newton, "Had you known Earl Allen before?" Officer Newton responded, "Yes." Defense counsel again objected, and the court instructed the jury to disregard the testimony. During closing argument the prosecutor argued:

> "The next witness, Ladies and Gentlemen, was Officer Thomas Newton. He was present on January 9th, 1978 at 1111 West Roosevelt Road in apartment 606 at approximately 8:30 p.m. He told you that when he came to that apartment, he was responding to a disturbance call. He told you he found in that apartment Willie

Hubbard, Geraldine Hubbard, the defendant Earl Allen, Sylvester Adams and Calvin Carter. He also told you that he knew Earl Allen for 10 years."

Defense counsel's objection to this statement was overruled.

■■ ■ It is fundamental that, as a general rule and subject to exceptions not applicable here, evidence which tends to show that an accused has committed crimes or acts of misconduct which are distinct and entirely unrelated to the one for which he is being tried is both incompetent and prejudicial. (*People v. Curry* (1975), 25 Ill. App. 3d 637, 640, 323 N.E.2d 778.) When evidence of prior criminality is not direct, but merely inferential, the determinative issue is the probative and prejudicial effect of the nexus between the admitted and prior criminality. (*People v. Price* (1979), 76 Ill. App. 3d 613, 633, 394 N.E.2d 1256.) In the case at bar there was no evidence before the jury that defendant had been arrested and charged with any crime other than the ones the jury were considering. The jury heard only that Officer Newton knew defendant for approximately 10 years, and that defendant had been charged with the instant murders. There was nothing before them to suggest that defendant had committed other crimes. As such, there was no direct evidence of actual prior criminality but only speculation. In our opinion those references, which provide no details as to whether a criminal activity was involved, what offenses they may have been, or on what bases defendant was suspected of committing them, were not substantially prejudicial. "It is not our policy to reverse a judgment of conviction merely because error has been committed, unless it appears that real justice has been denied or that the verdict of the jury may have resulted from such error." (*People v. Tranowski* (1960), 20 Ill. 2d 11, 17, 169 N.E.2d 347, 350.) A careful review of the record demonstrates that the evidence establishing defendant's guilt was overwhelming. Indeed, defendant does not contest the sufficiency of the evidence against him. We cannot conclude, therefore, that the prosecutor's comment influenced the result or that the verdict would have been otherwise had the remark not been made.

In support of his argument, defendant relies upon *People v. Richardson* (1977), 48 Ill. App. 3d 307, 362 N.E.2d 1104 (where the police officer testified "I have been up to the residence several times to arrest Mr. Richardson for other charges * * *"); *People v. Pitts* (1971), 1 Ill. App. 3d 120, 273 N.E.2d 664 (a narcotics prosecution wherein the police officer testified that defendant said he was in a lot of trouble and that he was on parole for selling drugs); *People v. Harges* (1967), 87 Ill. App. 2d 376, 231 N.E.2d 650 (where the prosecutor asked the defendant if he had ever seen the police station before); and *People v. Colston* (1967), 81 Ill. App. 2d 75, 225 N.E.2d 801 (where the police officer testified that he had obtained defendant's address from the Illinois State Parole Office). As is readily

apparent, the remark in the instant case falls far short of what has been considered prejudicial and reversible error.

Based upon the foregoing, we affirm the judgment of the circuit court of Cook County.

Affirmed.

HARTMAN, P. J., and DOWNING, J., concur.