THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
PERCY BANKS, Defendant-Appellant.

First District (2nd Division)    No. 80-1007

Opinion filed July 28, 1981.

Ralph Ruebner, of State Appellate Defender's Office, of Chicago (Leonard L. Cavise, of IIT-Chicago-Kent College of Law, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Adrienne Noble Nacev, and Christine Campbell, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Defendant, Percy Banks, was charged by indictment with murder and armed robbery. (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1, 18—2.) In a jury trial defendant was found guilty of murder and not guilty of armed robbery and was sentenced to serve 30 years in the Department of Corrections. On appeal defendant contends that he was not proven guilty beyond a reasonable doubt, that he was prejudiced by evidence of prior police contacts, and that the trial court erred in refusing to give the jury an instruction on the credibility of a narcotics addict. For the reasons which follow, we affirm defendant's conviction.

Shortly after midnight on February 23, 1979, Herman Mitchell was shot to death. The State's principal witness was Gladys Nash. Because of injuries Nash suffered in an automobile accident prior to trial, she was brought into court on, and testified from, a hospital bed.

Nash testified that on February 22, 1979, she went to the Apollo Lounge, located at 1659 South Pulaski. She arrived between 6 and 7 p.m. and stayed until midnight. Twice during the evening Nash left the bar to buy a pint of Richard's Wild Irish Rose wine at a liquor store across the street from the Apollo Lounge. Each time she brought the wine back to the lounge where she consumed it. She had at least one other drink which she purchased at the lounge. The owner of the Apollo Lounge, Bennie Williams, testified that Nash had three drinks of Harvey's Bristol Cream.

Between 11 and 11:30 p.m. Nash went to the washroom of the bar

and injected herself with heroin. Nash testified that she had used heroin on and off for about five years and that at the time of the offense, February 23, 1979, she was taking heroin three or four times a week. She supported her habit in part through prostitution and admitted that she had been convicted of prostitution, theft, battery and unlawful use of weapons. She had been a prostitute for 15 years. At trial, however, Nash stated that she had not used any narcotics for four months.

During the evening Nash was at the Apollo Lounge she spoke with a number of persons including the victim, Herman Mitchell, Michael Rogers and defendant. Nash had known Mitchell, who worked as a bartender and "waitress" for the lounge, for seven or eight years, Rogers since grade school and defendant since kindergarten. Two other witnesses, Thel Young and Bennie Williams, testified that defendant was at the lounge on February 22, 1979. Young encountered defendant outside the lounge between 10 and 10:30 p.m. Defendant told Young that he was waiting for Herman Mitchell. Defendant also said that he felt uncomfortable waiting inside the bar because he did not have any money.

Williams testified that he had seen defendant in his establishment with "another fellow" twice on the night of February 22, first at 7:30 then later at 10 p.m. Defendant spoke with Mitchell several times that evening as he had on earlier occasions.

Near midnight Nash stepped outside of the lounge, stood alone for a few moments and then met defendant and Rogers. The three of them waited for Mitchell who was assisting Williams in closing the bar. Williams paid Mitchell $18 per night for his work in the lounge. After Williams paid him on February 22, Mitchell gave Williams a $20 bill for safekeeping. Mitchell had never before asked Williams to hold money for him. Mitchell left the lounge at approximately 11:50 p.m.

After Mitchell came out, Nash, defendant, Rogers and Mitchell entered Mitchell's 1968 Oldsmobile 98. According to Nash, defendant was driving, Mitchell was in the front passenger seat, Rogers was sitting behind defendant and Nash was sitting behind Mitchell. Ricky Johnson, who admitted to a prior criminal record, corroborated this testimony.

Nash testified that they went in search of drugs and made two stops before they were able to purchase some, but she denied that she used any. They then drove to an alley behind 1900 South Harding. There Mitchell offered defendant $20 for a sex act. Defendant accepted the $20 but asked for more. Mitchell refused saying that he had some bills to pay. At this point a struggle began between defendant and Mitchell, during which Michael Rogers "went to grab" Mitchell. Defendant then pulled out a small handgun and shot Mitchell twice behind the back of his head at close range as Mitchell was trying to get out of the car. Nash jumped out

of the car and ran. She said the shooting occurred at approximately 12:30 a.m.

Nash did not report the murder to the police because she was afraid. When she did talk to the police, she initially denied any knowledge of the incident because she knew that defendant had not yet been arrested.

Mitchell's body was discovered at 3 p.m. on February 23, 1979, by a city garbage collection crew. The body was found lying face down in the snow in a vacant lot 10 to 15 feet west of the alley behind 1859 South Harding. A beat officer at the scene observed two small holes near the victim's right ear.

Dr. Tae An, an assistant medical examiner, testified that Mitchell had been shot twice on the right side of the head. The bullet wounds were one-half inch apart and approximately one-half inch above the top of the right ear. One bullet was deflected by the right temporal bone and was not suitable for comparison. The other bullet traversed the brain from right to left and from the back of the head to the front. That bullet was recovered and was identified as a .22 long rifle bullet. Because of the large amount of powder residue found, Dr. An concluded that Mitchell had been shot at very close range.

Homicide investigator Thomas Shine testified that he interviewed defendant about the Mitchell murder while defendant was in a police lock-up after February 22. Defendant told Shine that he had met Mitchell in November of 1978 and had visited him many times at Mitchell's home. Defendant said that he had had a homosexual relationship with Mitchell. Defendant told Shine that he had last seen Mitchell in late February 1979 but could not give an exact date. Defendant met Mitchell after Mitchell had left work. Mitchell loaned defendant some money and let him use his car. Mitchell's brother, McArthur Noel, testified, however, that Mitchell never loaned his car to anyone.

Defendant also told Shine that a girl named Gladys had told him that Mitchell had been shot to death. Defendant did not know who had killed Mitchell. Finally, Shine testified that defendant's co-defendant, Michael Rogers, had been discharged following a finding of no probable cause at a preliminary hearing.

Herman Mitchell's car was not found until April 1979. In the trunk of the car the police recovered a set of 1978 license plates registered to an automobile owned by defendant's father. The plates had been reregistered in the name of defendant's mother after her husband died in September 1977.

In defense, defendant's mother, Dorothy Banks, testified that the garage where the old plates had been kept was broken into in March 1979. She did not report the burglary to the police and did not know whether

the plates were still in the garage in February 1979. She had last seen them in December 1978.

Defendant was convicted of murder and acquitted of armed robbery. On the murder charge he was sentenced to serve 30 years.

## I

Defendant contends that he was not proven guilty beyond a reasonable doubt of the crime of murder because the testimony of the sole witness, Gladys Nash, was not entitled to any credence.

Defendant points out that Nash was a drug addict who supported her habit through prostitution. She had an extensive criminal record. Less than an hour and one-half before the murder Nash injected herself with heroin, which makes her "nod" and feel "high." By her own admission, Nash also consumed two pints of wine and at least one other drink at the lounge. The lounge owner testified that she had had three drinks of Harvey's Bristol Cream. And Nash initially lied to the police when they questioned her about the murder.

In the case at bar defendant has not confined his attack on Ms. Nash's credibility to what is evidenced in the record but has also hypothesized facts not of record in an effort to further discredit her testimony. Nash testified that she accompanied defendant, Mitchell and Rogers when they left the Apollo Lounge in Mitchell's car searching for more drugs. After one unsuccessful effort they were able to purchase some drugs and took them into their possession. Defendant comments that "the record does not indicate whether, at that point, Gladys Nash absorbed yet another quantity of drugs into her system." Both on direct and cross-examination, however, Nash denied that she used any of these drugs.

■■ Based on Nash's testimony that heroin makes her "nod" and feel "high," defendant raises "the distinct possibility that Gladys Nash was 'nodding' if not, by now, almost completely unconscious at a point just moments before she said the killing occurred." There is no evidence to support this hypothesis. Moreover, Nash herself testified that heroin did not make her oblivious of her surroundings. That a witness was in fact using drugs at the time of the incident does not in and of itself necessarily destroy her credibility. *People v. Cepolski* (1979), 79 Ill. App. 3d 230, 238, 398 N.E.2d 351.

■■ Defendant complains that Nash was allowed to testify in court from a hospital bed and states that "we can only surmise that the jury believed portions of her testimony * * * because they were influenced to sympathize with her physical state at the time of the testifying." Again, in his reply brief, defendant suggests that "any particularized scrutiny of her testimony because of her background may have been obviated by her clearly pitiable condition at the time of trial." This is mere conjecture.

Although the trial court denied defendant's motion to have the jury and the court hear her testimony in the hospital, we do not perceive how the risk of the jury responding sympathetically to the witness' condition would have been any less in that environment. Moreover, transporting the witness to the courtroom was certainly less cumbersome than moving an entire courtroom to the hospital. We also note that defendant failed to ask the trial court for a continuance until the witness would be able to come into court on her own.

■■ Defendant asserts on appeal that the jury's task of assessing the demeanor of a witness is substantially inhibited when the witness testifies from a "virtually prone position."[1] By the trial court's own remarks, however, it is evident that Nash's hospital bed was set at a 30° angle and that the jurors were able to look directly at her face as she testified. In *People v. Novotny* (1968), 41 Ill. 2d 401, 412, 244 N.E.2d 182, our supreme court held that "[i]t is neither the duty nor the privilege of a reviewing court to substitute its judgment as to the weight of disputed evidence or the credibility of witnesses for that of the trier of fact who heard the evidence presented and observed the demeanor of the witnesses * * *." We therefore decline defendant's invitation to "look at the testimony of Gladys Nash just as the jury presumably did."

Defendant states further that "it is not altogether inconceivable that her condition permitted her to speak only in low or soft tones, perhaps even whispers." The record is devoid of any support for this speculation. At no time during Nash's testimony did either defense counsel or the prosecutors or the trial court find it necessary to ask her to speak more loudly.

Defendant also conjectures that "defense counsel may certainly have been inhibited in using the tools of cross-examination, perhaps concluding that he was forced to exercise a certain amount of restraint and deference to the witness rather than risk the antagonism of the jury should he proceed with a customary aggressive examination." Again there is nothing in the record to support this speculation. To the contrary, the record shows that defense counsel conducted a vigorous and extensive cross-examination of the witness.

Defendant questions why Michael Rogers was not called to testify since, according to Gladys Nash's testimony, he was present at the time of the murder. Rogers was originally charged with Herman Mitchell's death but was discharged following a finding of no probable cause at a preliminary hearing on May 25, 1979. The State subsequently indicted Rogers on June 4, 1979. The charges against Rogers were nolle prossed on February 19, 1980, less than 10 days before defendant went on trial.

---

[1] At oral argument counsel stated unequivocally that Nash testified from "a prone position."

Defendant now seeks to draw a negative inference from the State's failure to call Rogers.

■■ The State is not obligated to call every witness to a crime (*People v. Nowak* (1970), 45 Ill. 2d 158, 168, 258 N.E.2d 313) and may accept the risk of negative inferences from the unexplained absence of a witness so long as the offense is otherwise proved (*People v. McElroy* (1964), 30 Ill. 2d 286, 290, 196 N.E.2d 651). No such inferences may be drawn, however, where the absent witness may, if called, assert a valid testimonial privilege. (Wigmore, Evidence §286 (Chadbourn rev. 1979).) It is apparent that if the State had tried to introduce the testimony of Michael Rogers, he could have invoked his fifth amendment right not to be compelled to incriminate himself and refused to testify.

■■ In his reply brief, defendant has advanced an interpretation of the evidence which, if believed, would be consistent with defendant's innocence. The difficulty with his interpretation is that it is, as defendant concedes, a hypothetical scenario for which there is no evidence in the record. This, however, was not a case in which the State relied exclusively upon circumstantial evidence. There was an eyewitness to the murder and therefore the jury was not obligated to exclude every hypothesis consistent with defendant's innocence. The proper question on review is whether the evidence is so improbable as to raise a reasonable doubt of defendant's guilt. *Novotny*, at 412.

■■ Defendant correctly states that the testimony of a narcotics addict or one who has used narcotics must be viewed with great suspicion. (*People v. Strother* (1972), 53 Ill. 2d 95, 99, 290 N.E.2d 201; *People v. Boyd* (1959), 17 Ill. 2d 321, 326, 161 N.E.2d 311.) However, the testimony of an addict may be sufficient to sustain a conviction if credible under the surrounding circumstances. *People v. Norman* (1963), 28 Ill. 2d 77, 82, 190 N.E.2d 819; *People v. Gilford* (1974), 17 Ill. App. 3d 131, 133, 308 N.E.2d 55.

Although Gladys Nash was the only eyewitness to the murder of Herman Mitchell, her testimony regarding the circumstances of the murder was clear and unimpeached. Moreover, her account was corroborated in many respects. There was eyewitness corroboration of defendant's presence in the Apollo Lounge the night of the murder and that defendant was waiting for the victim. There was eyewitness corroboration of the number, identity and seating position of the persons in Mitchell's Oldsmobile less than one-half hour before the crime. Expert testimony corroborated the number, range, location and caliber of shots fired at the victim, whose body was found only two or three doors away from where Nash said the shooting had occurred.

Investigator Shine testified that defendant told him he had last seen Mitchell in late February 1979 at which time he had borrowed some money from Mitchell and his car. When the victim's car was recovered,

the police found in the trunk old license plates registered to defendant's father who had died in September 1977. Uncontroverted testimony from the victim's brother established that Herman Mitchell never loaned his car to anyone. Finally, there was no explanation of how defendant would have learned of Mitchell's death through Gladys Nash when it is apparent, by her own testimony, that she feared defendant and had at first refused to tell the police that defendant had killed Mitchell.

In our judgment the evidence in this case was sufficient to sustain the finding of the jury that the defendant was proved guilty beyond a reasonable doubt of murder.

## II

Defendant argues that reversible error was committed when the prosecutor asked investigator Shine the following questions on direct examination:

"Q. Had you ever spoken with Percy Banks before that time during the course of your career?

A. Yes, sir.

Q. Approximately how many times?

A. Hard to estimate, maybe 20, 30."

At this point defense counsel objected and moved for a mistrial. The objection was sustained, and the jury was instructed to disregard the answer. The motion for mistrial was denied. On cross-examination defense counsel asked Shine whether it was correct that defendant had had a beard whenever Shine had spoken to him or had seen him. Shine answered, "The past ten years or so."

Defendant now asserts that these answers were severely prejudicial because they revealed that defendant had prior contacts with the police and tended to show that he had committed crimes unrelated to the ones for which he was being tried. We cannot agree.

■■ Initially we note that the second answer to which defendant objects was given in response to a question on cross-examination by defense counsel. Counsel was trying to impeach the testimony of certain other State witnesses who had said that defendant was not bearded. Since investigator Shine apparently had known defendant for many years, defense counsel inquired whether it was correct that whenever Shine spoke to or saw defendant he had a beard. We do not believe Shine's answer, "The past ten years or so" was unresponsive, and defendant will not be heard to complain of evidence he himself has elicited regarding an inference of prior police contacts. See *People v. Galloway* (1963), 28 Ill. 2d 355, 361, 192 N.E.2d 370.

Even if Shine's answer is considered nonresponsive, it was virtually indistinguishable from one held to be nonprejudicial in *People v. Allen*

(1981), 96 Ill. App. 3d 871, 422 N.E.2d 100. There the prosecutor asked an officer how long he had known the defendant. The officer answered, "Approximately ten years." The trial court sustained defense counsel's objection and instructed the jury to disregard the answer. The prosecutor then asked if the officer had known the defendant before. The officer responded, "yes," and again defense counsel's objection was sustained. In closing argument the prosecutor told the jury that the officer had known the defendant for 10 years. The court found that the remarks fell far short of what has been considered prejudicial and reversible error. 96 Ill. App. 3d 871, 879-80.

With reference to the question asked by the prosecutor in the case at bar, we observe that the trial court sustained defendant's objection and instructed the jury to disregard it. This prompt action by the trial court will normally suffice to cure any error. (*People v. Carlson* (1980), 79 Ill. 2d 564, 577, 404 N.E.2d 233.) Evidence that tends to show that an accused has committed crimes or acts of misconduct which are distinct and entirely unrelated to the ones for which he is being tried generally is both incompetent and prejudicial. (*People v. Curry* (1975), 25 Ill. App. 3d 637, 640, 323 N.E.2d 778.) When the evidence of prior criminality is not direct, but merely inferential, the determinative issue is the probative and prejudicial effect of the nexus between the admitted and prior criminality. *Allen*, 96 Ill. App. 3d 871, 879.

Here there was no evidence before the jury that defendant had been arrested and charged with any crimes other than the ones for which he was being tried. The jury was informed only that investigator Shine had spoken with defendant 20 or 30 times in the 10 years that he had known him and that defendant was always bearded. Nothing in this testimony suggested that defendant had committed other crimes. There was no direct evidence of actual prior criminality—only speculation. (*Allen*, at 879.) This serves to distinguish the cases on which defendant relies, *People v. Harges* (1967), 87 Ill. App. 2d 376, 231 N.E.2d 650 (where the prosecutor asked defendant whether he had ever before seen the police station to which he was taken subsequent to his arrest) and *People v. Colston* (1967), 81 Ill. App. 2d 75, 225 N.E.2d 801 (where a police officer testified that he had obtained defendant's address from the Illinois State Parole Office).

■■ As in *Allen*, the references in the instant case, "which provide no details as to whether a criminal activity was involved, what offenses they may have been, or on what bases defendant was suspected of committing them, were not substantially prejudicial." (96 Ill. App. 3d 871, 879.) We are unable to conclude that investigator Shine's testimony influenced the result in this case or that the verdict would have been otherwise had the answers now objected to not been given.

## III

Defendant contends that the trial court erred in refusing to give the jury either of his two instructions on the credibility of the testimony of a narcotics addict. The State responds that the instructions were properly refused since both referred to a witness who is addicted to narcotics at the time of trial. On the basis of Gladys Nash's testimony that she' had not used any narcotics for four months before trial, the State concludes that she was not an addict and that instructions implying that she was were erroneous. The State argues further that the general credibility instruction (Illinois Pattern Instructions, Criminal, No. 1.02 (1968) (hereinafter cited as IPI Criminal) "was sufficient to apprise the jury as to the caution that was necessary in weighing Ms. Nash's testimony."

At the conference on instructions defendant offered two instructions (13A and 13B) that dealt with the credibility of the testimony of a narcotics addict. The first instruction, 13A, contained two paragraphs. The first set forth the IPI instruction on impeachment by evidence of conviction of a crime. (IPI Criminal No. 3.12.) The second paragraph, which is not from IPI, stated: "When determining the evidentiary worth of the testimony of a narcotic addict, the jury must not judge the testimony as it would that of another type of witness. The jury must look upon the testimony of a narcotic addict with great suspicion, and act upon it with great caution." The second instruction, 13B, restated the second paragraph of 13A without repeating IPI Criminal No. 3.12. The trial court refused both instructions[2] commenting that the question of Ms. Nash's drug addiction was "better left to argument and the general credibility instruction [IPI Criminal No. 1.02, which was given]."

■■ In our opinion the instruction was properly refused. The language of the proposed instruction clearly implies that the witness was addicted to narcotics at the time of trial. Gladys Nash testified without contradiction, however, that she had not taken any narcotics for four months before trial. Whether her prior use of narcotics made her an "addict"at the time of the murder (see *People v. McKibben* (1974), 24 Ill. App. 3d 692, 695-96, 321 N.E.2d 362) does not establish the propriety of the instruction offered here.

An instruction that refers to the present tense does not focus upon drug addiction at the time of the observation. (*People v. Bryant* (1980), 85 Ill. App. 3d 836, 843, 407 N.E.2d 597.) An instruction must be supported by evidence introduced at trial. (*People v. Mitchell* (1975), 34 Ill. App. 3d 311, 321, 340 N.E.2d 226.) Since there was no evidence that Nash was

---

[2] The jury was separately instructed on impeachment by evidence of conviction of a crime (IPI Criminal No. 3.12) and on impeachment by evidence of prior inconsistent statements (IPI Criminal No. 3.11). Except for the inclusion of IPI Criminal No. 3.12 in defendant's instruction 13A, the two refused instructions are identical, and we shall refer to them as a single instruction.

addicted to narcotics at the time of trial, an instruction suggesting otherwise was erroneous and was properly refused. *People v. Smith* (1979), 70 Ill. App. 3d 250, 257, 387 N.E.2d 901; *People v. Franz* (1977), 54 Ill. App. 3d 550, 555, 368 N.E.2d 1091.

Defendant's reliance on *People v. Phillips* (1970), 126 Ill. App. 2d 179, 261 N.E.2d 469, and *People v. Boyd* (1959), 17 Ill. 2d 321, 161 N.E.2d 311, is misplaced. In *Phillips* the court approved an instruction given by the trial court that specifically referred to the use of narcotics "at about the time of the alleged offense." *Boyd* did not involve an instruction issue. Although the court characterized as an addict a witness who claimed not to have used narcotics in the six months preceding trial, the witness admitted on cross-examination that he was an addict. In the case at bar there was no such admission.

In *People v. Montanez* (1977), 55 Ill. App. 3d 215, 216, 371 N.E.2d 135, a case not cited by the parties, the witness, like the principal witness in the instant case, had stopped taking heroin four months prior to trial. The appellate court held that the trial court properly refused a defense instruction referring to a narcotics addict's credibility because the instruction used the present tense, implying that the witness was still an addict when in fact she denied that she was an addict, and defense counsel made no attempt to show by other evidence that she was an addict at the time of trial.

Defendant did not present the trial court with an instruction regarding the credibility of a witness who was an addict at the time of the alleged offense, and we need not reach the issue of the propriety of such an instruction. (*Montanez*; see also *People v. Blackwell* (1979), 76 Ill. App. 3d 371, 380-81, 394 N.E.2d 1329; *People v. Collins* (1977), 48 Ill. App. 3d 643, 650, 362 N.E.2d 1118.) In our judgment the trial court did not err in refusing defendant's instruction on the credibility of a narcotics addict.

For the foregoing reasons, the judgment of the circuit court of Cook county is affirmed.

Affirmed.

HARTMAN, P. J., and DOWNING, J., concur.