THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY BRADDOCK, Defendant-Appellant.

First District (1st Division)   No. 1—91—1615

Opinion filed June 1, 1993.—Rehearing denied July 1, 1993.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Eileen O'Neill, and Laura Bertucci, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Larry Braddock, was charged by information with criminal sexual assault, aggravated criminal sexual assault, home invasion, and residential burglary. He waived his right to a jury trial and, following trial, was found guilty of criminal sexual assault. The circuit court sentenced him to a 9½-year prison term. He appeals.

We affirm.

The victim, L.B., testified that she lived alone in an apartment at 3028 North Leavitt Street in Chicago. Her apartment, located on the second floor, was one of three in the building, a single-family house which had been redesigned to house separate tenants. L.B. knew defendant for about one month prior to the incident giving rise to the charges. L.B. also knew defendant's two brothers, one of whom lived on her street. She conceded that defendant may have been at some of the neighborhood parties which she attended because they had mutual acquaintances. L.B. never dated defendant although he had "asked [her] out." She declined because she did not consider defendant to be her "type" and because she "wasn't interested."

On September 2, 1989, L.B. returned to her apartment at 10 p.m. After talking to a friend on the phone and listening to the radio, L.B. fell asleep around midnight. At that time, the door to her apartment was locked and her window was "latched." Later that morning, L.B. was awakened by defendant, who was on top of her with his hand over her mouth. Defendant told her to "be quiet and you won't get hurt." Defendant then placed his hand around her throat, removed his clothing, and began to fondle her. L.B. was frightened of defendant and believed his threats against her. Defendant removed L.B.'s underwear and nightshirt and placed his penis in her vagina. Defendant told her that he had "always wanted" her. After the intercourse, defendant tried to pull L.B. next to him, but she objected. Defendant then "strangled" her, and L.B. stated that she "almost passed out." Defendant then "collapsed into a sleep." L.B. stated that this was around 5:30 a.m.

After making sure that defendant was asleep, L.B. got up and went into the kitchen to inspect the front door. It was not damaged. She noticed a screwdriver, which did not belong to her, resting atop the radiator near her bed. L.B. then noticed that the window screen was not in her window. L.B. got dressed quickly and left the apartment. She went to her mother's apartment, which was in the basement of the same building as L.B.'s apartment. Her mother phoned

for the police, who arrived several minutes later. L.B. told them that defendant was still in her apartment.

L.B. was taken to the hospital by police where she was examined and treated. L.B. denied that she had spoken to defendant on the afternoon of September 2 and denied that the two had made plans to see each other that night.

L.B.'s mother, Carol, testified that she lived in the basement apartment of the same building in which L.B. resided. Prior to the incident in question, Carol had warned L.B. to be more careful of "who she let up there." She also told L.B. not to host any parties in her apartment. On September 3, 1989, Carol was awakened by L.B.'s screams at around 6 a.m. L.B. was outside her door "screaming, jumping up and down and shaking." Carol described her daughter as "hysterical" and took her next door to a neighbor's house to call police. Carol noticed several red marks on L.B.'s neck.

Theresa Tucker testified that she had spoken to L.B. on September 2 between 10 p.m. and midnight. She next heard from L.B. the following morning when L.B. called her to ask her to meet her at the hospital. At the hospital, Tucker noticed that L.B. had bruises on her neck and was "hysterical."

Chicago police officer Steven Doyle was called to the scene in response to a criminal sexual assault complaint. He and his partner met with L.B. and her mother upon arriving at the address. L.B. informed him that her assailant was still in her apartment. Doyle found defendant in the apartment, asleep and naked. Doyle placed defendant under arrest and then took L.B. to the hospital. Doyle described L.B. as "hysterical." She also had "red marks" on her neck and arm.

Arthur Dunne, an evidence technician with the Chicago police department, processed the scene. He found a hat, later identified as belonging to defendant, under a tree adjacent to the window of L.B.'s apartment.

The parties stipulated that Dr. Lisa Horn treated L.B. at the hospital. L.B. told Dr. Horn that she had been raped. Dr. Horn's examination revealed tenderness and redness to both L.B.'s shoulder and neck areas, which was indicative of "recent trauma."

James Nuckles, defendant's cousin, testified on defendant's behalf. Nuckles has known L.B. for seven years. On August 28, 1989, he and L.B. were at a party together and left to go to L.B.'s apartment to watch some movies. L.B. told Nuckles that he could not make any noise in the house because she was not allowed to have anyone there.

Defendant testified that he worked as a carpenter for the Chicago Northwestern Railroad. He had known L.B. for six to seven years,

but knew her only by the name "Cricket." Defendant had been to her apartment before September 3, 1989. He had apparently been invited to a party held there by L.B.'s roommate at the time. He had also attended several other parties in the neighborhood and had seen L.B. at them.

During the afternoon of September 2, 1989, defendant was visiting his brother who lived on the same street as L.B. Defendant saw L.B. walking down the street and asked her if she had plans for the evening. Defendant suggested that the two "could get together" when L.B. stated she had no plans for the evening. According to defendant, L.B. replied, "sure."

At around midnight, defendant was at a bar with his friend, Peter Clark. Clark was the brother of defendant's brother's wife, and defendant gave Clark a ride to her home, which was near L.B.'s apartment. After dropping Clark off at the house, defendant went to L.B.'s house and knocked on the door for 15 minutes. When he received no answer, he went into the yard and yelled up to L.B.'s apartment. L.B. then let him in through the front door.

In the apartment, L.B. gave him a beer and then the two began "making out." They then engaged in consensual intercourse. Defendant later fell asleep and was awakened by police.

Defendant was taken to the police station where he told police that L.B. had admitted him into her apartment, that he and L.B. had sex, and that L.B. had consented to it. When defendant was told that his hat had been found in L.B.'s yard, defendant told them that he had climbed the tree to gain access to the apartment. Defendant maintained that he told police this only because they had promised him that he would be charged with battery and could "get out" on a bond. Defendant stated that he was crying and was upset because he did not want to lose his job.

In rebuttal, Chicago police detective Robert Guerrero stated that defendant initially told him that L.B. had let him into her apartment around 1 a.m. The two shared a beer, smoked some marijuana, and engaged in consensual sex. Guerrero then left the interview room. When he returned, he asked defendant why he lied to them because defendant's brother had told police that defendant had been drinking with him until 4:30 a.m. Moreover, defendant's hat had been found in L.B.'s yard and a window had been found out of its sill in L.B.'s apartment. Defendant then admitted to him that he had been drinking until 4:30 a.m. and, after, went to L.B.'s home where he climbed a tree and went through the window. He denied raping L.B.

Assistant State's Attorney Kim Novi also testified that she interviewed defendant at the police station. He told her that he had climbed a tree and entered L.B.'s apartment through a window. He also told her that he had been drinking that night and that "whenever he drinks, he gets into trouble like this." He told Novi that "in fact, he got in the same kind of trouble when he was in Iowa." Defendant maintained that he did not rape L.B.

On appeal, defendant asserts that he was denied a fair trial due to the admission of certain testimony concerning similar "trouble" in Iowa. Specifically, defendant questions the propriety of the following exchange which occurred during his cross-examination:

"Q. [by the assistant State's Attorney:] Did you tell her that you always get into trouble when you drink, and the same thing happened to you in Iowa.

A. [defendant:] No, I did not."

In rebuttal, assistant State's Attorney Novi testified that defendant had told her that he had been drinking prior to going over to the victim's home, and that "whenever he drinks, he gets in trouble like this, and in fact, he got in the same kind of trouble when he was in Iowa." Defendant insists that this evidence could only suggest that he had a propensity to commit the charged offense.

Defendant, however, did not object to this testimony nor did he raise the issue in his post-trial motion. As a result, the issue is waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Defendant acknowledges his waiver of the issue, but suggests that he received ineffective assistance of counsel in this area. Because he makes that claim, we will review the issue on the merits.

Generally, in order to establish ineffective assistance of counsel, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that a reasonable probability exists that, but for the error, the result of the trial would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) In adopting *Strickland,* our supreme court noted that a defendant bears a heavy burden to overcome the strong presumption in favor of a finding that defense counsel's advocacy was effective. (*People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) Further, the determination of the reasonableness of trial counsel's actions must be evaluated from counsel's perspective at the time of the alleged error, without hindsight, in light of the totality of the cir-

cumstances. *Strickland v. Washington*, 466 U.S. at 668, 80 L. Ed. 2d at 674, 104 S. Ct. at 2051.

Evidence which tends to show that an accused has committed crimes or acts of misconduct which are distinct and entirely unrelated to the one for which he is being tried is both incompetent and prejudicial. (*People v. Curry* (1975), 25 Ill. App. 3d 637, 323 N.E.2d 778.) When evidence of prior criminality is not direct, but merely inferential, the determinative issue is the probative and prejudicial effect of the nexus between the admitted and prior criminality. *People v. Price* (1979), 76 Ill. App. 3d 613, 633, 394 N.E.2d 1256.

In the present case, there was no evidence that defendant had been arrested and charged with any other crime other than those before the court. The trier of fact only knew that there had been similar "trouble" in Iowa and that defendant had been charged with the crimes at issue here. The term "same kind of trouble" is vague and could have referred to any one of the charges for which defendant was being tried. We note that the multicount information brought against defendant included not only criminal sexual assault charges, but charges of residential burglary and home invasion as well. In that way, the evidence that defendant complains of was not direct evidence of prior criminality, but only speculation. This court has previously held that

> "[i]n our opinion those references which provide no details as to whether a criminal activity was involved, what offenses they may have been, or on what bases defendant was suspected of committing them, were not substantially prejudicial." *People v. Allen* (1981), 96 Ill. App. 3d 871, 879, 422 N.E.2d 100.

Defendant's reliance on *People v. Hughes* (1977), 51 Ill. App. 3d 985, 367 N.E.2d 485, is misplaced. There, a police officer testified that, at the time of his arrest, defendant told him that "something similar to this happened in Troy, Missouri, and he had shot a man in Troy, Missouri." (*People v. Hughes*, 51 Ill. App. 3d at 988.) Counsel objected to the statement, and the trial judge admonished the jury that the statement was being allowed only for the purpose of what defendant said at the time he was arrested. (*People v. Hughes*, 51 Ill. App. 3d at 989.) On appeal, the appellate court found that defendant had waived the issue by his failure to raise it in his post-trial motion. Because the court had reversed the conviction on other grounds, the court found it "unnecessary" to determine whether the error amounted to plain error. (*People v. Hughes*, 51 Ill. App. 3d at 989.) Despite the finding of waiver and without its excusal under the plain error rule (134 Ill. 2d R. 615(a)), the court addressed the issue merely

to avoid future problems on retrial. Given this treatment, we question how binding that portion of the *Hughes* opinion is on this court. In any event, the *Hughes* court found that the remark was improper because a reference to another shooting incident could only suggest to the jury a propensity to commit such offenses. Moreover, the appellate court found the circuit court's admonishment to the jury to be incorrect. As noted previously, the testimony at issue here was vague and did not contain a specific reference to any of the crimes for which defendant was on trial.

We have reviewed the other cases cited by defendant and find them distinguishable as they address more egregious remarks than those at issue here. For these reasons, defendant has not met his burden in establishing that his trial counsel was ineffective.

■ Defendant next contends that L.B.'s testimony was improperly bolstered when the court allowed testimony from other witnesses, namely her mother, the examining room physician, and police officers, which repeated L.B.'s charges of sexual assault.

Defendant neither objected to the testimony at trial nor included the issue in his post-trial motion. As a result, it is waived. (*People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124.) Moreover, we find no basis to excuse this waiver under the plain error doctrine. See *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.

■ Defendant also maintains that the State failed to prove his guilt beyond a reasonable doubt, arguing that L.B.'s testimony was fraught with inconsistencies and contradictions.

A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) Upon review, the appellate court's function is not to retry the defendant, but to ascertain whether, after viewing the evidence in the light most favorable to the prosecution, " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

Essentially, defendant claims that L.B.'s testimony is unbelievable. However, in a bench trial, it is the function of the trial judge to determine the credibility of witnesses, to weigh evidence, and to draw reasonable inferences from that evidence, as well as to resolve any conflicts. (*People v. Berland* (1978), 74 Ill. 2d 286, 305-06, 385 N.E.2d 649, *cert. denied sub nom. Wolf v. Illinois* (1979), 444 U.S. 833, 62 L.

Ed. 2d 42, 100 S. Ct. 64.) Moreover, the reviewing court will not set aside the circuit court's judgment unless the proof is so unsatisfactory, improbable, or implausible as to justify a reasonable doubt as to the defendant's guilt. *People v. Johnson* (1986), 114 Ill. 2d 170, 190, 499 N.E.2d 1355, *cert. denied* (1987), 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618.

Applying these principles to the present case, it appears that the trial judge was aware that L.B. contradicted herself as to whether she and defendant knew each other, but resolved any conflicts against defendant. The trial judge also noted that L.B. was a "rather simple person" who was "easily misled," but who was "clear and convincing" as to the elements of the assault. A review of the record reveals that any contradictions made by L.B. were not of such a magnitude as to justify a reasonable doubt of defendant's guilt. Defendant also places much weight on the fact that L.B. was not allowed to have visitors in her apartment and, therefore, needed to fabricate a story which would explain defendant's presence in her apartment. This argument is unpersuasive. There was no evidence presented which would establish that anyone knew that L.B. had a visitor. Given that fact, there was no need for L.B. to run to her mother's apartment in the hysterical manner testified to at trial. Such an outcry would serve only to draw attention to defendant's presence, a presence which, up to that point in time, had gone undetected. Accordingly, we will not disturb the circuit court's finding of guilt.

The judgment of the circuit court is affirmed.

Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.