THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* THOMAS MORANO, Defendant-Appellant.

First District (3rd Division)   No. 78-638

Opinion filed February 28, 1979.

---

* Justice Buckley participated in this decision while assigned to the Illinois Appellate Court, First District.

Julius Lucius Echeles, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Joan S. Cherry, and Wesley H. H. Ching, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

The defendant, Thomas Morano, was sentenced to 7 to 15 years imprisonment after a jury in the circuit court of Cook County convicted him of attempted murder. (Ill. Rev. Stat. 1975, ch. 38, par. 8—4.) On appeal he contends he was deprived of a fair trial because: (1) the court did not correctly instruct the jury on the elements of attempted murder;

(2) the prosecutor, in his closing argument, made improper comments; (3) the court allowed hearsay testimony to be introduced concerning identification of the defendant; and (4) the court unfairly admitted prejudicial photographs of the defendant into evidence.

Albert Suma was shot and permanently paralyzed from the chest down. Both Suma and Judith Hull, his companion on the night he was shot, testified that before the shooting they had visited several taverns in Chicago, Illinois. Sometime between 11:30 and midnight on Saturday, February 22, 1975, they left a tavern, intending to drive to either Hull's home or to another tavern. As Suma merged his car on to the Stevenson Expressway entrance, a black 1973 or 1974 Cadillac sped by, almost colliding with him and forcing him into a guardrail. The Cadillac did not stop but continued on to the expressway, traveling west. Suma inspected the damage to his car, then chased after the Cadillac, hoping to get its license number. He overtook the Cadillac and noted the license number, TM 336. Both Suma and Hull stated that they saw two persons sitting in the front seat of the Cadillac.

Suma said the Cadillac veered from lane to lane in front of him, preventing him from exiting the expressway. While both cars were in the right lane of the expressway, the Cadillac unexpectedly stopped, causing Suma to halt his car 10 to 15 feet behind it. The man driving the Cadillac got out of it and rapidly walked toward Suma's car. Suma and Hull described the driver as a white man with dark hair in his 20's, 5'6" or 7" tall weighing about 160 lbs. Hull said she noted that he carried a .38 caliber gun in his hand as he walked toward their car.

Suma opened his car door. The driver of the Cadillac was by that time less than two feet away from him. Suma stated he looked up at the driver. The driver simultaneously kicked the car door shut and shot Suma in the chest. Suma turned to Hull, repeated the license number of the Cadillac, TM 336, and passed out. Hull wrote the number in the dust on the dashboard of Suma's car.

Suma made an in-court identification of Morano as the man from the Cadillac who shot him. He also testified that he was shown four or five photographs of different men by the police and asked to pick out the person who shot him. Suma said he chose Morano's photo.

Hull made an in-court identification of Morano as the man who shot Suma. She testified that she was shown five or six photographs by the police, and identified Morano's picture from this group. On direct examination she said she also identified Morano out of a group of men at a police lineup. She denied that anyone described his appearance to her before the lineup.

Glenn and Rita Lesniak also witnessed the shooting on the Stevenson Expressway. Their description of the incident corroborated the version

given by Suma and Hull. They testified that the man who approached Suma's car was a white male in his 20's with black hair, 5'7" or 8" tall and weighing 155 to 160 lbs. At trial both said Morano looked like that man, although they stopped short of making a positive identification of him. They said they viewed a lineup at a police station. Glenn Lesniak said he chose Morano out of the lineup as looking like the man who did the shooting on the expressway but he could not positively identify him. Rita Lesniak testified in court that Morano looked like the man who did the shooting. She said that at the lineup she did not pick him out because she was not "100% positive" that it was he.

Several policemen testified about the incident and the investigation of it. Officer Ptak said he showed five or six police department photographs to Hull. He testified she identified the pictures and that Morano's picture was in the group. He also showed the pictures, including the defendant's, to Suma. Suma, according to Ptak, identified one picture from that group as the picture of his assailant, saying, "This is the man." Upon objection by Morano, the latter remark was stricken from the record and the jury cautioned to disregard it. The photographs used for the identification, however, were admitted into evidence over Morano's objection, after all writing on them was blanked out. Officer Crescenzo testified that he conducted a lineup at a police station several months after the shooting. On cross-examination, he said he did not tell any person who viewed the lineup anything about the defendant. Another State's witness said that in April 1975, he purchased a 1974 black Cadillac from Morano.

During the trial the Assistant State's Attorney, Michael Agran, testified that after Hull's appearance in court, she told him that her testimony concerning her lineup identification of Morano was untrue. She said she was told ahead of time by a police officer, not Crescenzo, what Morano would wear and what he looked like so that she could easily pick him out. Hull testified a second time and admitted this. Although she said her identification of Morano was not positive, she was fairly sure that he was the man who shot Suma.

Morano, Michael DiFoggio and Angeline Worth, testified for the defense. Morano said that on February 22, 1975, at about 2 p.m., he went to a bar in Chicago called the Play Spot. He stayed there for about two hours, had several drinks and went home. He drove back to the bar at about 8:30 or 9 p.m, that evening in his car, a 1974 black Cadillac with license plate TM 336. He said he drank heavily and that about 11:30 p.m., he fell asleep on the bar. His friend DiFoggio, the bartender, woke him, took his car keys from him and drove him home. They rode in DiFoggio's car, leaving Morano's Cadillac near the bar.

Morano said that about 1:30 a.m., while at his home, his father woke him and told him that the police were looking for him because his car was

involved in a shooting. He testified he went back to the Play Spot at 2 a.m., and asked DiFoggio for the keys to the Cadillac, explaining that the car was involved in a shooting. Morano asserted that he looked outside the Play Spot for his car but could not find it.

DiFoggio's testimony substantially corroborates the testimony of Morano. However, he stated that he never reported anything about it to the police. DiFoggio denied giving the Cadillac keys to anyone that night and testified that he was not aware of what Morano did between 11:30 p.m. and 2 a.m. after he left him at home. He said that at 3 a.m., when the Play Spot closed, he and Morano drove around the vicinity in DiFoggio's car, looking for the Cadillac. They did not find it. After several hours, DiFoggio drove to Morano's cousin's house in Cicero, Illinois and left Morano there.

Morano said he borrowed money from his cousin and rented a room under an assumed name where he lived until May 1975. During the time he stayed at the rooming house, both Morano and his sister, Angeline Worth, testified that they spoke to each other frequently over the phone. During the conversations Worth told him that the police and others were looking for him and wanted to shoot him. She testified that her brother would not tell her where he was because he was afraid.

A few days after the shooting DiFoggio said he found Morano's Cadillac near the Play Spot and told Worth about it who relayed the information to Morano. Morano said he soon after picked up the car. Although he said the ignition of the car was missing, he managed to start it and drove it out of the neighborhood to his lodgings.

In closing, defense counsel argued that DiFoggio failed to go to the police because he was frightened and felt he too would be arrested. The State, in its rebuttal argument, suggested that DiFoggio was afraid of arrest because he was the second person in the Cadillac on the expressway at the shooting.

The jury found the defendant guilty of attempted murder under the following instructions.

Instruction No. 11:

"A person commits the crime of attempt who with the intent to commit the crime of murder does any act which constitutes a substantial step toward the crime of Murder.

The crime attempted need not have been committed."

Instruction No. 12:

"A person commits a crime of murder who kills an individual if, in performing the act which caused the death, he intends to kill that individual;

or

> *he knows that such acts will cause death to that individual*;
> or
> *he knows that such acts create a strong probability of death to that individual.*" (Emphasis added.)

Instruction No. 13:

> "To sustain the ·charge of attempt the State must prove the following propositions:
> *First*: that the defendant performed an act which constituted a substantial step toward the commission of a crime of Murder; and
> *Second*: that the defendant did so with the intent to commit the crime of Murder."

Morano contends plain error occurred when the trial court instructed the jury on the elements of the offense of attempted murder because the instruction defining murder (Instruction No. 12) would permit the jury to convict him without finding that he had specific intent to murder.

■■ The crime of attempt is a specific intent crime: "An instruction must make it clear that to convict for attempted murder nothing less than a criminal intent to kill must be shown." (*People v. Harris,* consolidated with *People v. Shields* (1978), 72 Ill. 2d 16, 27, 377 N.E.2d 28, 33.) There can be no conviction for the criminal offense of attempt to achieve an "unintended" result. *People v. Viser* (1975), 62 Ill. 2d 568, 581, 343 N.E.2d 903, 910.

The instruction defining murder given the jury in this case contains three descriptions of the crime: an act performed by an individual who either "intends to kill" or "knows" his acts will cause death or "knows" his acts "create a strong probability of death." We will begin by considering the instruction as it defines murder in the third alternative.

Two recent Illinois Supreme Court opinions touched on a similar instruction in attempted murder cases wherein murder was defined as knowing that acts created "a strong probability of causing death or great bodily harm." (*People v. Shields,* found in *People v. Harris*; *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888.) The court in reversing the convictions in *Shields* and *Trinkle* held that the "great bodily harm" language in the instruction failed to indicate the specific intent required for attempted murder because it permitted the jury to convict the defendant if he "intended only to cause great bodily harm short of death." *People v. Harris* (1978), 72 Ill. 2d 16, 27, 377 N.E.2d 28, 33.

The instruction at issue in this case does not contain the great bodily harm language. This jury was charged with the proposition that they might convict Morano of attempted murder if he intended and took a substantial step toward an act which he knew created a strong probability of death. The question before us, then, is whether knowing

that conduct creates a strong probability of death sufficiently shows the specific intent to kill.

We believe it does. The instruction is couched in terms of the probability of "death" as opposed to the instructions in *Trinkle* and *Shields* which were found wanting because they were framed in terms of "great bodily harm." The drafters of the Model Penal Code considered this distinction in terms of the intended or believed result of an actor's conduct. They stated that it was error to convict a person of attempted murder if he acted only "with intent to inflict grievous bodily harm." (Comments to the Model Penal Code §5.01, at 29 (Tent. Draft No. 10, 1960).) However, if the actor believed that his conduct would cause the result forbidden by criminal law—in this case, death—and did "all in his power to cause the result to occur" he could be convicted of attempted murder. (Comments to the Model Penal Code §5.01, at 29 (Tent. Draft No. 10, 1960).) They suggest the example of a man who, with the purpose of destroying a building, intends to dynamite it. If he does so knowing and believing that persons inside the building will be killed, although not consciously desiring the inhabitants to die, there would be an attempt to kill. (Comments to the Model Penal Code §5.01, at 29 (Tent. Draft No. 10, 1960).) The belief on the part of an actor that certain results would follow his conduct is sufficient to show a specific intent for that result to occur. (See also *People v. Shields* (1955), 6 Ill. 2d 200, 206, 127 N.E.2d 440, 443.) In the instant case, the instruction that Morano would have committed murder if he knew that his conduct would result in a strong probability of death permitted the jury to convict him of attempted murder only if it found that he specifically intended the consequences of his actions to be the death of Suma.

■■ A similar specific intent is evident in the first and second alternative descriptions of murder in the instruction. Therefore, we find that the trial court properly instructed the jury on the elements of attempted murder.

■■ Morano next argues that the prosecutor's statement portraying DiFoggio as the second man in the car at the time of the shooting was made without evidentiary support and unfairly discredited DiFoggio. This argument fails for two reasons. First, the prosecutor's remark can be said to have been prompted by the statement of the defense counsel, made in his closing, that DiFoggio's fear of being arrested stopped him from going to the police. The prosecutor was disputing this argument when he said: "I submit to you * * * that Michael DiFoggio * * * was the second man in Morano's Cadillac. I submit to you that's why Michael DiFoggio did not go to the police." When the argument of a defense counsel invites or provokes a response, the prosecutor's reply is not subject to objection. (*People v. Kelly* (1975), 25 Ill. App. 3d 753, 324

N.E.2d 82.) The prosecutor's argument in this case can be characterized as such a response.

Second, we believe the prosecutor's remarks are proper inferences from the evidence. DiFoggio was the only defense witness to corroborate Morano's testimony about his actions on the night of the shooting. DiFoggio placed himself with Morano near the time of the shooting when he testified that he drove Morano home in his car at about 11:30 p.m. The shooting took place at midnight and all eyewitnesses state that there was a second person in the car driven by Suma's assailant. While DiFoggio said he and Morano were in DiFoggio's car and not the Cadillac, the prosecutor could legitimately argue from those facts that DiFoggio was the second person the eyewitnesses described. See *People v. Hill* (1977), 45 Ill. App. 3d 14, 358 N.E.2d 1350.

Finally, Morano asserts that Officer Ptak's testimony concerning the photographic identification made by Hull and Suma unfairly prejudiced him. He contends that it was hearsay and that it improperly bolstered and corroborated the testimony of Suma and Hull. In addition, he asserts that the introduction into evidence of police department photographs used to identify him improperly implied that he had a criminal record.

■■ We find neither of these arguments persuasive. The admission of Ptak's testimony concerning the photographic identification was not reversible error. Both Suma and Hull were witnesses at trial and were available for cross-examination about the identifications. Such an opportunity obviates the necessity of the hearsay objection. (See *People v. Robinson* (1978), 73 Ill. 2d 192, 383 N.E.2d 164; *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363; *People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738; *People v. Smith* (1978), 64 Ill. App. 3d 1045, 382 N.E.2d 298.) And while Ptak's testimony may have improperly corroborated and bolstered Hull's weakened identification of Morano, its overall effect was negligible in light of Suma's identification and the evidence given by the Lesniaks. See *People v. Smith*; *People v. Warmack* (1976), 44 Ill. App. 3d 243, 358 N.E.2d 76.

■■ Further, Morano failed to properly object to Ptak's testimony at trial. His only objection to Ptak's testimony concerning Suma's photographic identification of him went to Ptak's repetition of a comment Suma made in regard to the identification; the remark was stricken from the record. Morano did not contest the substance of Ptak's testimony concerning Hull's identification at all. Such evidence, when not objected to, should be given its natural and probative effect, as if it were admissible. *People v. Koester* (1975), 31 Ill. App. 3d 28, 332 N.E.2d 755.

■■ The actual admission of the police photographs into evidence also is not reversible error. As Morano correctly states, the identity of Suma's

assailant was the central issue in the case. The admission of the photos used to identify Morano as that man was relevant to show that the identification procedures employed were accurate and that Suma and Hull both could have recognized Morano from the pictures.

■■ Admission of police department photos depends on the balancing between their probative value and their prejudicial effect. When the identity of the defendant is a question and precautions are taken to minimize possible prejudice by blanking out all legends on them, as was done here, police department photos are admissible. See *People v. Byrd* (1976), 43 Ill. App. 3d 735, 357 N.E.2d 174.

We, therefore, affirm the judgment of the circuit court of Cook County.

Affirmed.

SIMON, P. J., and McNAMARA, J., concur.