THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOE LEE MARTIN, Defendant-Appellant.

Third District    No. 80-50

Opinion filed August 12, 1980.

Robert Agostinelli and G. Joseph Weller, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward Keefe, State's Attorney, of Rock Island (John X. Breslin and Gary Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE STOUDER delivered the opinion of the court:

This is an appeal by the defendant, Joe Lee Martin, from the determination of the Circuit Court of Rock Island County finding the defendant guilty of rape, deviate sexual assault and burglary following a bench trial. In this appeal, the only issue raised is whether the trial court's finding that the defendant was legally sane at the time of committing the charged offenses must be reversed as palpably erroneous where psychiatrists for both sides agreed that the defendant suffers from chronic schizophrenia and, in all likelihood, could not conform his conduct to legal requirements.

At the trial, the only witness called by the State during its case-in-chief was the victim, Martha Hobbs. The victim testified that, in the early morning hours of October 22, 1978, she was at home sleeping on her couch. She felt something on her leg and reached down to brush it away. It was then that she felt a hand. She immediately turned over and saw a

man. He was about six to eight inches away from her, perched on his elbow, between the couch and coffee table. The defendant then placed one hand over the victim's eyes. As she started to scream, he immediately placed his other hand over her mouth, and told her not to scream. He then asked the victim where her husband was and what time he would be returning. She told him that her husband was at work and would return at approximately 4:30 a.m. With that, he asked about her children, wanting to know if she had any girls upstairs. The victim pleaded with the defendant several times not to hurt the children. She further explained that her daughter was only a baby and again begged him not to hurt the children.

After obtaining this information, the defendant lifted the victim's nightgown and told her that if she screamed or made any noises he would kill her. He removed his hand from her mouth, but told her to keep her eyes closed. He then placed his penis in her mouth and forced her to perform an act of fellatio on him. This lasted for about two to three minutes. Afterwards, the defendant proceeded to have intercourse with the victim for five to 10 minutes. Prior to having intercourse, the defendant told the victim that she had better make it good for him or else he would kill her.

After the defendant was finished, he told the victim that he was going to remove his hand from her eyes but that she was to keep them closed. At that point, he stood up and took her daughter's baby blanket, which had been in a doll buggy, and placed it over the victim's face and tucked it in around her head. He then told the victim not to move or yell or else he would return and kill not only the victim but her children as well.

The victim was able to make a positive in-court identification of the defendant, having seen him on numerous occasions at a market where she had previously been employed. She further testified that all of the doors and windows in her house had been locked, and that the defendant spoke in a very low voice, somewhat louder than a whisper.

Three witnesses were called by the defense, the defendant's two sisters, Ella Mae Harris and Lucretia Donalson, and a psychiatrist, Dr. Eric Ritterhoff. In addition, the defense presented documentary evidence showing that the defendant had been found not guilty of rape and burglary by reason of insanity on November 24, 1975, in Bureau County, Illinois.

Both of his sisters testified that the defendant had severe mental problems at about the time of the offense which caused him to behave very strangely. Specifically, he carried on conversations with nonexistent people, he liked to stay in dark places, and he appeared to be afraid that someone was trying to kill him. His sisters thought him to be insane. They

also noted that he would not take medicine which had been prescribed for this condition.

The defense psychiatrist stated that the defendant suffers from chronic schizophrenia and mild mental retardation. In response to a hypothetical question by defense counsel which incorporated facts concerning the defendant's past medical history and certain observations made by the defendant's sisters prior to October 22, 1978, Dr. Ritterhoff opined that it would be "highly unlikely" that such a person could conform his conduct to the law.

On cross-examination it was established that Dr. Ritterhoff saw the defendant on February 9 and February 22, 1979, some 3½ to four months after the instant occurrence. The defendant was seen again by this psychiatrist on August 16, 1979. At the first two sessions, the defendant was cooperative at times, but would then become evasive. However, the August 16 meeting proved more fruitful. The defendant was more coherent and consistent, and he was better able to cooperate with answering questions.

The defense psychiatrist further testified that if the defendant had been taking any medication, he could have had lucid periods and then lapse back into a mental deficiency. In response to the hypothetical question, the doctor stated that an individual like the defendant, although suffering from a continual psychosis, could very possibly be psychotic on a particular day and then lucid the next. However, based upon his total observations the psychiatrist was unable to actually determine with any degree of medical certainty that at the time defendant raped the victim he either had or did not have a mental deficiency. In response to a second hypothetical question asked by the prosecutor, incorporating the facts of the instant incident into the hypothetical question, the psychiatrist was of the opinion that the facts related could possibly be in keeping with the disease that had been described in the defendant. It was equally possible however that the defendant at the time of the instant offense was lucid and not suffering from any mental defects. Even so, he revealed on redirect examination his "simple" opinion that "chances are," "in terms of statistics," the defendant was psychotic at the time of the offense.

The State called another psychiatrist as a rebuttal witness, Dr. Thomas T. Tourlentes. Dr. Tourlentes examined the defendant in February and again in August 1979, and was able to elicit some information from the defendant. Apparently, two reasons existed for the defendant's reluctance to talk to the psychiatrist, his general mental state and the fact that his attorney had told him not to talk about the reason he was there. This psychiatrist agreed with Dr. Ritterhoff that the defendant was chronically psychotic and was of limited intelligence.

Dr. Tourlentes, in response to a hypothetical question, was of the opinion that it was possible that an individual, such as the defendant, who had not taken any medication for a period of six months could have varying periods of lucidity. Before and after such periods of rationality, he may lapse back into his psychosis. But, while he was lucid, such an individual's behavior would appear to be organized and purposeful and, in that sense, suggest an increased awareness of significance of his behavior.

In response to a second hypothetical question, which included the defendant's background and the events of October 22, 1978, Dr. Tourlentes stated that it was possible that the defendant could have understood the criminality of his acts. However, the doctor also stated that the defendant could have possibly still been suffering from a psychosis under the facts of the hypothetical. He explained that a person can be psychotic and behave in a superficially appropriate or expected manner which is acceptable by societal standards but still be motivated by a psychotic personality. In other words, a person who is psychotic may still carry on as society expects and understand or appreciate the criminality of his conduct. However, when pressed for further clarification as to what degree the defendant's judgment or mental capacities could be impaired, the psychiatrist was only able to say that the defendant had a significant impairment of his mental capacities, but he was unable to qualify his statement any further. On cross-examination, Dr. Tourlentes added that the defendant was likely to have been psychotic at the time in question. In this regard, he testified that "in all probability" the defendant "had a continuous psychotic process of significant proportion" and "that it was highly likely that he also had that kind of symptomatology actively present at the time of the incident." He, therefore, agreed that the defendant would not be able to conform his conduct to legal requirements as a result of his condition. He also testified that the defendant would be highly unreliable in taking his medication, and although he might be "lucid," might appreciate, to some limited degree, that he was doing wrong, he would not be able to control his actions.

The trial judge found the defendant guilty of the charged offenses in a lengthy written opinion. That opinion concludes:

"There was nothing bizarre about the defendant's conduct on the morning of October 22, 1978. He made his entrance stealthily. He was extremely aware of the importance of the victim not being able to identify him, to the extent that the victim saw him only a few seconds during a period of 15 to 20 minutes. He prevented her from screaming to attract assistance. He inquired about the presence of her husband. He also appears to have been aware of

the power he could exert over the victim by virtue of the presence of her young children upstairs.

    The Court does not discount the testimony of the two sisters or the two psychiatrists. However, the law requires that the court not consider insanity of the defendant, either before or after the crime, as a legal excuse. Only insanity existing at the very time of the crime can excuse the defendant. (*People v. County* [*sic*], 106 Ill. App. 2d 258, 246 N.E.2d 91 (1969).

    Since the actions of the defendant in the presence of Martha Hobbs on the morning of October 22, 1978, were not similar to the bizarre incidents related by his sisters; and since each psychiatrist testified that the defendant could have lucid moments, it is my duty, as trier of facts, to determine whether a reasonable person would believe that Martha Hobbs' testimony describes the conduct of a lucid person.

    It does."

■■ While all men are presumed sane, if the defendant raises the affirmative defense of insanity by presenting sufficient evidence of insanity as to create a reasonable doubt of sanity, the burden shifts to the State to prove beyond a reasonable doubt that the accused was legally sane at the time the offense was committed. (*People v. Arnold* (1974), 17 Ill. App. 3d 1043, 309 N.E.2d 89.) A defendant will not be held criminally responsible for his conduct if, at the time of his conduct, he lacked a substantial capacity to either appreciate the criminality of the conduct or conform his conduct to the requirements of the law by reason of a mental disease or defect, which by definition do not include any abnormality manifested by repeated criminal conduct or other antisocial behavior. Ill. Rev. Stat. 1979, ch. 38, par. 6—2.

    Whether the State has fulfilled its burden is a question for the trier of fact to determine. (*People v. Jackson* (1976), 42 Ill. App. 3d 919, 356 N.E.2d 979.) In deciding this question, and thereby determining whether the defendant was legally sane at the time of the offense, the trier of fact must consider the totality of the evidence, weighing the testimony and determining the credibility of the witnesses, both lay and expert, without being required by law to accept the opinions of psychiatrists concerning the defendant's sanity. (*People v. Goodwin* (1980), 83 Ill. App. 3d 203, 403 N.E.2d 1051; *People v. Sims* (1976), Ill. App. 3d 401, 342 N.E.2d 256.) Once a determination of sanity is made by the trier of fact, that finding will not be disturbed by a reviewing court unless it is so palpably erroneous as to demonstrate that it was based on prejudice or passion. *People v. Kuhn* (1979), 68 Ill. App. 3d 59, 385 N.E.2d 388.

■■ In the case at bar, the testimony of the psychiatrists can be characterized, at best, as indicating that while, in all probability, the

defendant was unable to conform his conduct to the law, it was also possible for the defendant to have lucid moments and the expert witnesses were unable to testify with any medical certainty that the defendant was mentally deficient at the time of the offense. As a result, the trial court based its determination on the circumstances surrounding the offense, as testified to by the victim, and found that the defendant did appreciate the criminality of his conduct and was, therefore, legally sane.

This determination can not be said to be palpably erroneous. That the defendant was aware of the criminality of his conduct is obvious. He made a stealthy entrance. He prevented the victim from screaming by placing his hand over her mouth and by intimidation, threatening to kill her. He was aware of the importance of the victim not being able to identify him and attempted to prevent it by placing a hand over her eyes, ordering her to keep her eyes closed, and by wrapping a baby blanket around her head as he left the victim's home.

In addition, the evidence tends to establish that the defendant used his knowledge of the presence of children in the house to intimidate the defendant into performing the sexual acts he demanded. Moreover, he inquired as to the location of the victim's husband and of his expected arrival time. From the defendant's questions concerning the victim's husband, a reasonable inference may be drawn that the defendant could have conformed his conduct to the requirements of the law if the victim's husband was present in the house or his arrival was imminent.

For the foregoing reasons, the judgment of the Circuit Court of Rock Island County is affirmed.

Affirmed.

ALLOY, P. J., and SCOTT, J., concur.