THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRANK DEAN TEAGUE, JR., Defendant-Appellant.

First District (1st Division)   No. 79—2095

Opinion filed August 30, 1982.—Rehearing denied September 21, 1982.

CAMPBELL, P. J., dissenting.

Steven Clark and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Martin D. Reggi, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Following a jury trial, defendant was found guilty of three counts of attempt murder, two counts of armed robbery and one count of aggravated battery committed on February 5, 1977. Judgment was entered only on the attempt murder and armed robbery counts and defendant was sentenced to concurrent terms of imprisonment of 30 years on each count.

On appeal, defendant raises numerous issues, including the manner and scope of *voir dire*, the State's improper use of peremptory challenges, allegedly improper lay and expert witness testimony, the propriety of jury instructions and prosecutorial comments, reasonable doubt and the effective assistance of counsel.

At trial, defendant pleaded not guilty by reason of insanity. He now contends that he was denied a fair and impartial jury because sufficient inquiry was not made of the jurors regarding their attitudes

toward psychiatry and the insanity defense to enable him to excuse jurors for cause and to intelligently exercise his peremptory challenges. He alleges that only those jurors who admitted to having had prior contact or experience with psychiatrists were questioned directly as to whether they had any bias or prejudice against psychiatrists.

As stated in *People v. Dallas* (1980), 85 Ill. App. 3d 153, 405 N.E.2d 1202, *appeal denied* (1980), 81 Ill. 2d 595, *cert. denied sub nom. Cooper v. Illinois* (1981), 450 U.S. 1000, 68 L. Ed. 2d 202, 101 S. Ct. 1708, the only legitimate purpose of a *voir dire* examination is to assure the selection of an impartial jury. Under Supreme Court Rule 234 (73 Ill. 2d R. 234), the trial court has primary responsibility in conducting the *voir dire* towards that end. The court may, in its discretion, permit the parties to submit additional questions to it for further inquiry. An abuse of discretion will be found only if, after reviewing the record, it is determined that the court's failure to ask defendant's tendered questions thwarted the selection of an impartial jury. 85 Ill. App. 3d 153, 165.

Preliminary to the *voir dire* of prospective jurors, the trial judge informed the parties that he would conduct the questioning of jurors himself and that proposed questions could be submitted in writing. He questioned all of the prospective jurors generally and a few individually regarding whether they could follow the law as embodied in his instructions regardless of their opinion of the defense of insanity. He also preliminarily questioned the entire venire regarding whether there was anything about the defense of insanity which would prevent them from being fair and impartial. Defendant submitted a list of questions regarding the insanity defense which he contends were necessary to discern any bias or prejudice towards psychiatry or psychiatrists. The court rejected said questions as inappropriate. We have reviewed the record and we do not find such to be an abuse of discretion.

■ As we have previously stated, the purpose of a *voir dire* is to select a fair and impartial jury; it is not to be used as a means of pre-educating or indoctrinating a jury or as a means of impaneling a jury with particular predispositions. (*People v. Nicholson* (1978), 61 Ill. App. 3d 621, 626, 377 N.E.2d 1063; *Gasiorowski v. Homer* (1977), 47 Ill. App. 3d 989, 365 N.E.2d 43.) In *Gasiorowski*, the court approved of a direct inquiry into a prospective juror's bias or prejudice which evoked direct and apparently honest responses from the various jurors. (47 Ill. App. 3d 989, 993.) In the instant case, the trial court made repeated inquiries regarding the insanity defense and the ability

to remain impartial, which inquiries were made applicable to all of the prospective jurors. At defense counsel's request, the court agreed to and did ask additional follow-up questions of those prospective jurors who had indicated they had had previous dealings with psychiatrists. Of those who had never utilized the services of a psychiatrist, the judge inquired throughout the *voir dire* whether anything they had heard, including the more specific questions put to the other jurors, would affect in any way their ability to remain fair to both sides. The record is replete with inquiries such as the following:

"THE COURT: Is there anything that you have heard me ask some of these other people that would make you feel you could not be fair to the defendant and the State as well if you remain as a juror here?"

and of another panel:

"Is there anything you have heard so far, or anything that maybe has been suggested in some way or another that would make you feel you could not be a fair juror if you remained here as a juror?"

Clearly, the judge observed the prospective jurors and was satisfied that their responses were direct and honest. There is nothing before us to indicate an abuse of discretion with regard to the *voir dire* and the impaneling of a fair and impartial jury.

Defendant argues that due process and the right of defendant to a trial by a fair and impartial jury were violated by the State utilizing all of its peremptory challenges to exclude black jurors. The record shows that the State exercised all of its 10 peremptory challenges to exclude blacks. Defendant moved for a mistrial after the State had used six challenges against six blacks and again at the conclusion of the jury selection proceedings. The State did not deny that it had used its 10 challenges to excuse 10 blacks, but pointed out that the defense had also excused a prospective black juror, that it had peremptorily excused a white juror who was a prospective alternate and that it was attempting to achieve a balance of men and women and age groups. While an examination of the record shows that white jurors who fell within the men, women and age groups to which the State referred were not excused peremptorily by the State, we do not agree with defendant's contentions.

It is true that it is constitutional error to exclude a group as a group where it is shown that the group has been systematically prevented from jury service or on particular juries. (*Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824; *People v. Gaines* (1981), 88 Ill. 2d 342, 430 N.E.2d 1046.) No showing of any

such systematic action, however, has been made here.

Defendant relies principally on *People v. Payne* (1982), 106 Ill. App. 3d 1034, 436 N.E.2d 1046, which cites *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692, *People v. Wheeler* (1978), 22 Cal. 3d 258, 583 P.2d 748, 148 Cal. Rptr. 890, and *Commonwealth v. Soares* (1979), 377 Mass. 461, 387 N.E.2d 499, *cert. denied* (1979), 444 U.S. 881, 62 L. Ed. 2d 110, 100 S. Ct. 170, and seeks to distinguish *Swain* and the Illinois cases which followed *Swain.* In *People v. Payne* (1982), 106 Ill. App. 3d 1034, 1040, 436 N.E.2d 1046, 1050, the appellate court stated:

"Accordingly, we hold that when it reasonably appears to the trial court, either by its own observation or after motion by the defendant, that the prosecuting attorney is using peremptory challenges to systematically exclude blacks from the jury solely because they are blacks, the court should require the prosecutor to demonstrate, by whatever facts and circumstances exist, that blacks were not being systematically excluded from the jury solely because they were blacks. At this stage, the burden of demonstrating that the Constitution was not being violated is upon the prosecution. Also, at this stage, the trial court should not employ any presumption that the Constitution is not being violated. Once it reasonably appears to the trial court that the accused is being affirmatively denied an impartial jury as required under the sixth amendment, there is no reason to presume that the State is not affirmatively violating the accused's constitutional entitlement."

In that case, the court also stated that "a defendant is constitutionally entitled to a petit jury that is as near an approximation of the ideal cross section of the community as the process of random draw and constitutionally acceptable procedures permit." 106 Ill. App. 3d 1034, 1037, 436 N.E.2d 1046, 1048.

This court, in *People v. Fleming* (1980), 91 Ill. App. 3d 99, 413 N.E.2d 1330, *appeal denied* (1981), 83 Ill. 2d 571, expressly refused to follow the doctrine of the representative cross section of the community as enunciated by the Supreme Court of California in *People v. Wheeler*, stating:

"We agree with the Wisconsin Court of Appeals that 'the test proposed by the California court is vague and uncertain, and severely limits the scope of peremptory challenges. If peremptory strikes can only be exercised in a certain way, dependent on circumstances, and subject to judicial scrutiny, they will no longer be peremptory. We refuse to undertake such an altera-

tion of the very nature of the peremptory system.' *State v. Grady* (1979), 93 Wis. 2d 1, 13, 286 N.W.2d 607, 612. \*\*\*." (91 Ill. App. 3d 99, 105.)

See also *People v. Allen* (1981), 96 Ill. App. 3d 871, 422 N.E.2d 100; *People v. Tucker* (1981), 99 Ill. App. 3d 606, 425 N.E.2d 511; *People v. Lavinder* (1981), 102 Ill. App. 3d 662, 430 N.E.2d 243; *People v. Belton* (1982), 105 Ill. App. 3d 10, 433 N.E.2d 1119. We adhere to our holding in *Fleming* and decline to adopt the view expressed in *Payne*.

If, as *Payne* holds, the State under the circumstances there posited has to show a basis for its peremptory challenges, then the peremptory challenge has been so effectively emasculated as to destroy its function which *Swain* and Illinois has recognized (*People v. Harris* (1959), 17 Ill. 2d 446, 451, 161 N.E.2d 809):

> "The fact that the State's exercise of peremptory challenges resulted in excluding them [blacks] from the petit jury did not deprive defendant of any constitutional right. [Citation.] The right of peremptory challenge is a substantial one which should not be abridged or denied. It may, by its very nature, be exercised or not exercised, according to the judgment, will or caprice of the party entitled thereto, and he is not required to assign any reason therefor. [Citation.]"

Further, if the law in Illinois is to be the abolition of peremptory challenges as enunciated in *Payne*, the problem should be met forthrightly by the legislature by abolishing peremptory challenges to make all challenges challenges for cause and place their exercise in the discretion of the trial judge. This would be in keeping with the modern trend to give the jury selection process to the trial judge. (73 Ill. 2d Rules 234, 431.) See *People v. Jackson* (1977), 69 Ill. 2d 252, 371 N.E.2d 602, holding that section 115—4(f) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 115—4(f)), which gave opposing counsel the right to conduct *voir dire* examination of prospective jurors for the purpose of determining their qualifications, was a legislative infringement upon the "judicial power" of the court as reflected in Supreme Court Rule 234 and, hence, was void.

■ We find no constitutional infirmity in the State's exercise of its peremptory challenges.

Defendant next contends that he was not proved guilty beyond a reasonable doubt because the State failed to prove he was sane at the time of the offense. He argues that sufficient evidence was introduced at trial to raise a reasonable doubt of sanity and that the State then failed to sustain its burden of proving sanity beyond a reasonable doubt.

Two psychiatrists testified for the defense, giving substantially different diagnoses, yet agreeing that defendant could not conform his conduct to the law on the night of February 5, 1977. Dr. Ziporyn examined defendant on two occasions, the first time being some nine months after the offense and again almost a year later. Defendant exhibited no particular abnormalities in terms of sensorium: his memory and ability to calculate were intact and his apperception was within normal limits. Defendant exhibited hyperactivity of the body and rumination. Dr. Ziporyn performed no psychological tests on the defendant nor did he speak to any members of defendant's family, defendant's co-workers or police personnel. He did not question defendant about the events of February 5, 1977. In response to a hypothetical question which assumed facts as had been testified to by defendant's mother and brother and the circumstances of the offense, Dr. Ziporyn expressed the opinion that defendant was suffering from a psychoneurotic anxiety reaction at the time of the offense, as a result of which he lacked the substantial capacity to appreciate the criminality of his conduct and was unable to conform his conduct to the requirements of the law. On cross-examination, Dr. Ziporyn stated that it is possible for a person suffering from a psychoneurotic anxiety state to conform his conduct to the requirements of the law.

Dr. Seglin also testified for the defense. It was his opinion that defendant was suffering from a hysterical fugue state on the date in question, which caused him to act in an automatic, robot-like manner and as a result of which defendant could not appreciate the criminality of his acts. Dr. Seglin also testified that amnesia was one aspect of a fugue state and it was his opinion that defendant had total amnesia between the time he left his home in Rock Island, Illinois, and recovered his memory in the Oak Park hospital on the night of the arrest. His opinion was based on a single interview with the defendant two years after the offense. On cross-examination, defendant's remarks to a newspaper reporter made two or three days after the offense were interjected into the hypothetical, inducing Dr. Seglin to change his diagnosis from a total amnesia to a partial one. The doctor also testified that driving one's automobile in conformity with the rules of the road was conforming one's conduct to the requirements of the law.

Defendant's mother and brother both testified as to defendant's background, including the fact that he had been incarcerated for almost eight years on a bank robbery conviction which was subsequently reversed. During his incarceration, defendant suffered from much stress; his grandmother, who had raised him, died and his common-law wife and daughter left the State, cutting off communication

with him. Upon his release from prison, he entered into a hasty and short-lived marriage and worked two jobs while attending college. Since his release, defendant appeared to be under considerable stress, to be depressed and have sudden mood changes. Both defendant's mother and brother were of the opinion, however, that defendant knew the difference between right and wrong. He drove a car and followed traffic rules. Defendant had never done anything in their presence to indicate that he was unable to conform his conduct to the requirements of the law.

We agree with defendant that sufficient evidence was adduced to bring his sanity into issue. The question then is whether the prosecution sustained its burden of establishing defendant's sanity on February 5, 1977, beyond a reasonable doubt. We find that the State has met its burden.

The issue of a defendant's sanity at the time of the offense is generally a question of fact for the jury and a jury's finding on the issue of insanity will not be disturbed unless it is so manifestly against the weight of the evidence as to indicate the verdict was based on passion or prejudice. (*People v. Martin* (1980), 87 Ill. App. 3d 77, 81, 409 N.E.2d 114, *appeal denied* (1980), 81 Ill. 2d 604; *People v. Spears* (1978), 63 Ill. App. 3d 510, 517, 380 N.E.2d 423, *appeal denied* (1978), 71 Ill. 2d 620.) We also note that a jury is not required to accept the conclusions of a psychiatrist and may properly reach a finding of sanity by accepting lay testimony over expert testimony. (See, *e.g.*, *People v. Ford* (1968), 39 Ill. 2d 318, 235 N.E.2d 576.) Moreover, the weight to be given an expert's opinion is measured by the reasons given for the conclusion and the factual details which he marshals in support of it. (*People v. Meeker* (1980), 86 Ill. App. 3d 162, 169, 407 N.E.2d 1058.) Resolution of contradictory testimony and determination of its weight and credibility are for the trier of fact. *People v. Ward* (1974), 19 Ill. App. 3d 833, 313 N.E.2d 314.

The State introduced expert testimony which was in direct conflict with the findings of defendant's experts. Dr. Kaplan, a psychiatrist, interviewed defendant on August 12, 1977, for some 50 minutes, pursuant to court order, for the purpose of determining his fitness for trial. Dr. Kaplan found defendant fit to stand trial. An initial diagnosis of a passive aggressive personality with alcoholism was based on the results of psychological tests performed on defendant and a social worker's report of an interview with defendant's wife. At the time of the interview on August 12, defendant was unable to relate any details regarding the events of February 5. Dr. Kaplan did not at that time form an opinion as to defendant's mental state at the time of the

offense. Contrary to the opinion of Dr. Seglin, who had testified for the defense, Dr. Kaplan testified at trial that it was very difficult to conceive of an individual suffering from a hysterical fugue state to rob a grocery store at gunpoint, since the nature of a hysterical fugue state has to do with some conflict that the person suffering has a great deal of difficulty facing up to. Dr. Kaplan diagnosed defendant at trial as having an antisocial personality disorder, and he expressed the opinion that defendant could, on February 5, 1977, appreciate the criminality of his acts and conform his conduct to the requirements of the law. In addition to his interview of defendant and the previously mentioned reports, Dr. Kaplan based the later diagnosis on police reports of the incident, defendant's criminal history and a newspaper interview containing defendant's account of the circumstances of the offense and his reactions, given only days after the incident.

We cannot say that the jury's decision to discount the testimony of defendant's experts was manifestly against the weight of the evidence. (See *People v. Mahon* (1979), 77 Ill. App. 3d 413, 395 N.E.2d 950, *appeal denied* (1980), 79 Ill. 2d 628; *People v. Ford* (1968), 39 Ill. 2d 318.) The jury could and apparently did accord more weight to the testimony of the state's expert, which was corroborated by several lay witnesses:

Naaman Robey, a security guard on duty at an A & P store on the night of February 5, 1977, testified that he was in the rear of the store when he first noticed defendant, whom he mistook for an ordinary customer. Defendant approached him, put his hand on Robey's pistol, placed a gun in Robey's ribs and announced a stickup. In a clear voice, defendant told Robey to have the manager fill a satchel with money. He advised Robey that he would not kill him if he did as he was told. As they approached the store manager, defendant also ordered a customer in the area to join the group at gunpoint. Before he exited the store, defendant instructed the three of them to lie on the floor. At that time Robey noticed that defendant's face was covered with black shoe polish. Defendant's speech was not slurred, nor was he quivering, shaking or twitching, and he walked in a straight manner. Based on his specific observations of defendant during the course of the armed robbery, Robey expressed the opinion that defendant could "well know" what he was doing and could have conformed his conduct to the law.

Claus Kage, assistant manager of the A & P store, testified that at 10:30 p.m. on February 5, 1977, he was called to the service area, where Robey was standing with defendant beside him. Robey explained that defendant wanted money. Defendant directed them into

the office, where Kage found the safe empty. Defendant then directed him to look in the tills stuck in a cubbyhole and Kage placed the money from the tills in defendant's bag. Defendant had trouble with a small gate leading from the office and he ordered Kage to "get this damn door open." Defendant ordered them to lie down and ran out. Defendant did not appear to be in a trance or sick to his stomach. In Kage's opinion, defendant could appreciate the criminality of his acts in that "he knew precisely what he was doing." This opinion was based on the way defendant looked at him, the way he talked and the way he held his gun, which was very, very steady. Defendant was not violent and was operating in a normal manner. It was Kage's opinion that defendant was "sane."

Oak Park police officer Richard Toll testified that he was responding to a broadcast of an armed robbery at 10:30 p.m. on February 5. He stopped his car approximately 10 feet from the east exit of the A & P store while another officer, Dan Muth, stopped his vehicle 10 to 20 feet from the west exit. Toll observed defendant exit through the east door. As defendant passed Muth's vehicle on the passenger side, Muth shouted, "Halt, police." Defendant pulled out a gun and fired two shots over the roof of the car. Toll then fired a shot in defendant's direction and defendant turned and ran east through the parking lot. Both officers chased the defendant on foot, losing sight of him as they entered a gangway between two buildings. Defendant appeared from a distance of 30 to 40 feet, fired a shot which struck Muth in the thigh, and then fled. Toll observed defendant again for approximately two minutes in front of a nearby building. He expressed the opinion that defendant was sane and could appreciate the conduct in which he was participating.

Sergeant Clyde Van Nest testified he also was responding to the armed robbery broadcast on the night in question. He observed defendant head southbound and exit on the north side of a building. He pulled to the curb and ordered defendant to halt and drop his gun. Defendant, who was 30 feet from Van Nest at the time, dropped his gun and the vinyl case he was carrying. At Van Nest's direction, he put his hands on top of his head and dropped to his knees. The vinyl case contained another gun and an amount of U.S. currency. Before placing defendant in the squad car, Van Nest read him his *Miranda* rights from a preprinted card and defendant responded that he understood. Van Nest and Officer Michalek then transported defendant to the emergency room of Oak Park Hospital. Defendant told them he had a gunshot wound. Defendant walked unaided into the emergency room and followed directions given by a nurse, hospital personnel and

an X-ray technician. He also gave the nurse specific information required and signed his name on the admission form. Van Nest was with defendant the entire time between apprehending him and when he was taken to the police station some 2½ hours later.

Officer Frank Michalek testified he sat with defendant in the back of the squad car as he was transported to the hospital. He observed defendant sign an authorization form for treatment. Defendant did not ask what he was doing there nor did he look bewildered or astonished. When defendant was later taken to the police station, he provided Michalek with the required information to complete his arrest card. Defendant also chose his position in a station house lineup. Both Officers Van Nest and Michalek were of the opinion that defendant could conform his conduct to the requirements of the law.

Defendant does not dispute that nonexperts who have had opportunities to observe a person may give their opinion of his mental condition or capacity. (*People v. Krauser* (1925), 315 Ill. 485, 510, 146 N.E. 593; *People v. Patlak* (1936), 363 Ill. 40, 1 N.E.2d 228.) Rather, he contends that the lay witness opinion testimony elicited by the state was either wholly lacking in foundation or distorted the legislatively prescribed test of insanity, thereby creating a misapprehension of law which improperly influenced the jury. Specifically, defendant contends that the State blurred and weakened the more discriminating aspects of the statutory definition of insanity by eliciting lay witness testimony which equated defendant's sanity with whether he knew the difference between right and wrong, knew what he was doing or had the ability to follow traffic laws, thereby ignoring the concept of substantial capacity and the existence of a mental disease or defect.

Section 6—2 of the Criminal Code of 1961, which defines the affirmative defense of insanity, provides in part (Ill. Rev. Stat. 1975, ch. 38, par. 6—2):

> "(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."

In contrast to the earlier rule in Illinois, which required a finding of total incapacity to know that certain conduct was wrong, the present test is based on a determination of substantial incapacity to appreciate the wrongfulness of particular conduct. (*People v. Spears* (1978), 63 Ill. App. 3d 510, 516; American Law Institute Model Penal Code sec. 4.01; Ill. Ann. Stat., ch. 38, par. 6—2, Committee Comments, at

329 (Smith-Hurd 1972).) The principal question raised by an assertion of the insanity defense is "whether defendant's incapacity proceeds so far as to render him incapable of 'conform(ing), his conduct, to the requirements of the law.' " (Ill. Ann Stat., ch. 38, par. 6—2, Committee Comments, at 329 (Smith-Hurd 1972).) Thus, an accused who understood the nature of his conduct and appreciated its wrongfulness will still be excused from criminal liability if his ability to consciously refrain from that conduct was substantially impaired by a mental disease or defect. *People v. Spears* (1978), 63 Ill. App. 3d 510, 516.

■■ We find that the State has satisfied its burden by the facts in evidence and by the ample lay witness opinion testimony presented at trial. (See *People v. Young* (1978), 60 Ill. App. 3d 351, 353, 376 N.E.2d 739, *appeal denied* (1978), 71 Ill. 2d 614.) As previously stated, the general rule is that nonexperts who have had an opportunity to observe a person may give their opinions of his mental condition or capacity based on facts observed, including conversations with him. To render such opinions admissible, they must be limited to conclusions drawn from the specific facts to which they testify. (*People v. Patlak* (1936), 363 Ill. 40, 44; *People v. Krauser* (1925), 315 Ill. 485.) Whether sufficient facts and circumstances have been testified to is within the discretion of the trial court and absent an abuse of discretion, its determination will not be reversed on appeal. *People v. Lechner* (1976), 35 Ill. App. 3d 1033, 1041, 342 N.E.2d 820, *appeal denied* (1976), 63 Ill. 2d 553; *People v. Kuntz* (1977), 52 Ill. App. 3d 804, 809.

■ We find no such abuse of discretion here. Several lay witnesses testified as to facts and circumstances from which the jury could have drawn its conclusion. The testimony that defendant appeared normal was substantiated by defendant's apparent ability to follow instructions given to him on the night of February 5. In addition, the evidence at trial included the fact that defendant's automobile was found some one-half block from the scene of the crime containing several articles, including a can of black shoe polish, cotton balls and rubbing alcohol. The existence of a plan or design for a crime, especially for escape and prevention of detection or concealment of the crime, has been held to be a factor of particular relevance to a defendant's sanity. (*People v. Spears* (1978), 63 Ill. App. 3d 510, 519; *People v. Dunigan* (1981), 96 Ill. App. 3d 799, 822, 421 N.E.2d 1319, *appeal denied* (1981), 85 Ill. 2d 569.) We find that the evidence showed a substantial plan: defendant carried a satchel in which to conceal his weapon and to place the proceeds of the robbery. He disguised himself by covering his face with shoe polish. His getaway car was posted nearby. When ordered to halt by Officer Muth, defendant

fired two shots before fleeing down a gangway. From the totality of the evidence presented, the jury could properly find that defendant both appreciated the criminality of his conduct and could conform his conduct to the law on the date in question.

Defendant next contends he is entitled to a new trial where alleged errors may have caused the jury to reject the defense of insanity without examining the evidence. Specifically, defendant alleges that the State elicited certain testimony on cross-examination which unfairly discredited defendant's expert witness and that the trial judge then erred in barring certain testimony which would have shown bias on the part of the State's expert. When coupled with the prosecutor's closing argument which denigrated the defense of insanity, he argues that the alleged defects constitute reversible error. We do not agree.

We first note that none of the alleged defects were objected to at trial or by way of a post-trial motion. Failure to make a timely objection to improper remarks generally constitutes a waiver of that issue for purposes of appeal. (*People v. Skorusa* (1973), 55 Ill. 2d 577, 304 N.E.2d 630; *People v. Boyd* (1980), 88 Ill. App. 3d 825, 856, 410 N.E.2d 931, *appeal denied* (1981), 82 Ill. 2d 586, *cert. denied* (1981), 454 U.S. 1080, 70 L. Ed. 2d 613, 102 S. Ct. 633.) Moreover, the trial court is in a better position than a court of review to determine the prejudicial effect, if any. Notwithstanding the rule, a reviewing court may consider the argument if the defendant would be so prejudiced as to be denied a fair trial. *People v. Brown* (1974), 20 Ill. App. 3d 1064, 1066, 313 N.E.2d 488; *People v. Boyd* (1980), 88 Ill. App. 3d 825, 856.

Defendant's expert, Dr. Seglin, was cross-examined after testifying to his opinion that defendant was insane at the time of the offenses. Defendant contends that the prosecution discredited Dr. Seglin's testimony by repeated inferences that the doctor hid behind the doctor-patient privilege by advising defense attorneys not to request written reports regarding their client's sanity. In closing argument the harm was compounded, defendant alleges, by the State's comparison of Dr. Seglin to Dr. Kaplan, the State's expert, who had that very morning testified for the defense. In surrebuttal, the defense then attempted to prove bias of the State's expert by showing that the trial in which he had testified that morning was a stipulated bench, as opposed to a contested hearing. We have examined each of the alleged defects in context and find none of them to present reversible error, either individually or cumulatively.

■ We note first that the two experts testifying for the defense gave substantially different diagnoses. As we have already stated, the

jury was free to accept either testimony or could discount both testimonies. (*People v. Spears* (1978), 63 Ill. App. 3d 510, 518.) Since we find the lay opinion testimony and other factors in evidence sufficient to uphold the jury's finding of defendant's sanity beyond a reasonable doubt at the time of the offenses, any purported error in this regard must be considered harmless. Further, a reviewing court will not find a prosecutor's arguments prejudicial error unless the jury would have reached a contrary verdict had the improper remarks not been made. *People v. Boyd* (1980), 88 Ill. App. 3d 825, 855-56.

We likewise find little merit in defendant's argument that he was precluded from proving a fact in surrebuttal which would have established bias of the State's expert. While we agree that showing interest, bias or motive is an accepted method of impeachment (*People v. Thompson* (1979), 75 Ill. App. 3d 901, 903, 394 N.E.2d 422, *appeal denied* (1979), 79 Ill. 2d 623), we find no abuse of discretion in the trial court's determination that the factor which defendant sought to introduce was neither material nor impeaching. The evidence showed that Dr. Kaplan had testified approximately 15 times for the defense. His opinion as to defendant's sanity was corroborated by numerous lay witnesses, as well as by facts in evidence. In light of the foregoing, the barring of the specific factor which defendant sought to establish cannot be said to have been a material factor in defendant's conviction.

Defendant also contends that reversible error occurred when the jury was not properly instructed on the element of intent required for attempt murder or on lesser included offenses than those charged. Since defendant failed to raise these objections at trial or by written motion, we may consider them pursuant to Supreme Court Rule 451(c) only if there is a substantial defect in the instructions or the interests of justice so require. 85 Ill. 2d R. 451(c); *People v. Pardo* (1980), 83 Ill. App. 3d 556, 564, 404 N.E.2d 501, *appeal denied* (1980), 81 Ill. 2d 597.

The tendered instructions on attempt murder were as follows:

"A person commits the crime of attempt who, with intent to commit the crime of murder, does any act which constitutes a substantial step toward the commission of the crime of murder. The crime attempted need not have been committed.

A person commits the crime of murder who kills an individual if, in performing the acts which cause the death, *he intends to kill that individual; or he knows that such acts will cause death to that individual.*

To sustain the charge of attempt, the State must prove the

following propositions:

> *First*: That the defendant performed an act which constituted a substantial step toward the commission of the crime of murder; and

> *Second*: That the defendant did so with intent to commit the crime of murder; and

> *Third*: That the defendant was then sane." (Emphasis added.)

Defendant argues that the instructions as given, even though there was a specific reference to the intent to kill, allowed the jury to convict him if they found he had something less than specific intent to murder. He distinguishes between the intent to murder and knowledge that one's acts will cause death. The court in *People v. Morano* (1979), 69 Ill. App. 3d 580, 387 N.E.2d 816, *appeal denied* (1979), 79 Ill. 2d 616, dealt with similar instructions which were couched in terms of knowledge of "the probability of death" and concluded that "[t]he belief on the part of an actor that certain results would follow his conduct is sufficient to show a specific intent for that result to occur." 69 Ill. App. 3d 580, 586. See also *People v. Shields* (1955), 6 Ill. 2d 200, 206, 127 N.E.2d 440.

■ The cases cited by defendant, including *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28, *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331, and *People v. Jones* (1979), 81 Ill. 2d 1, 405 N.E.2d 343, are distinguishable in that they each involved instructions containing alternate definitions of murder framed in terms of "great bodily harm." The instruction at issue does not contain the objectionable language and was therefore proper. *People v. Morano* (1979), 69 Ill. App. 3d 580; *People v. Hancock* (1980), 83 Ill. App. 3d 700, 704-05, 404 N.E.2d 914, *appeal denied* (1980), 81 Ill. 2d 595; see also *People v. Barker* (1980), 83 Ill. 2d 319, 415 N.E.2d 404, *cert. denied* (1981), 452 U.S. 964, 69 L. Ed. 2d 976, 101 S. Ct. 3116.

■ We similarly reject defendant's contention that the jury should have been instructed regarding the lesser included offense of reckless conduct. It is within the province of the jury to decide whether or not the accused is guilty of the crime charged or of a lesser included offense where there is evidence which tends to prove the lesser, rather than the greater, crime. Nonetheless, where the evidence shows the accused is either guilty of the higher offense or not guilty of any offense, an instruction on the lower offense is unnecessary and properly refused. (*People v. Thompson* (1976), 35 Ill. App. 3d 773, 776, 342 N.E.2d 445, *appeal denied* (1976), 63 Ill. 2d 554.) We hold that the evidence presented was sufficient to convict the defend-

ant of the higher offense and that defendant has therefore failed to show substantial defects in the instructions given to require reversal.

Having reviewed the record with regard to defendant's two remaining contentions, we feel that they can be disposed of summarily. Defendant contends that his constitutionally guaranteed rights to be present at trial and to confer with his counsel were violated when, after repeated warnings from the trial judge, he was removed from the courtroom for disrupting the proceedings. Defendant does not dispute that such an act was within the court's discretion, but argues that reversible error occurred when he was transported back to the jail, as opposed to the courthouse lockup, for a matter of hours. Defendant also contends that he was denied the effective assistance of counsel where the defense attorney failed to adduce evidence that his prior incarceration on a bank robbery conviction was unjust, although evidence that said conviction was reversed and never retried was presented. He maintains that this fact, if introduced, may have influenced the jury to credit the evidence that his wrongful conviction had contributed to his mental illness.

We find little merit in either of these claims in view of our findings with regard to reasonable doubt and the sufficiency of the evidence pertaining to defendant's guilt. Further, there is nothing in the record to indicate that defendant was deprived of very thorough and competent representation throughout the course of the proceedings, far surpassing the minimum standards for representation required by law.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McGLOON, J., concurs.

PRESIDING JUSTICE CAMPBELL, dissenting:

I agree with the majority that the evidence of guilt was overwhelming as to the charges against defendant. I respectfully dissent, however, insofar as the majority has affirmed the judgment of conviction and refused to grant a new trial, where defendant, a black man, raised the issue of racial bias where the State exercised 10 of its peremptory challenges to excuse every black person from the jury. No black juror sat on the jury.

Defendant's counsel objected to the tactics of the State and stated, "As the Court is aware State exercised 10 peremptory chal-

lenges and each challenge excused a Black person. I feel that my client is entitled to a jury of his peers, your honor. I feel that he is being denied this. I would ask the Court for a mistrial." The State responded by stating that "there was an attempt, your Honor, to have a balance of an equal number of men and women as the jury is now comprised there are seven men and five women sitting on the jury. We feel counsel's motion is totally improper."

The court then stated, "Counsel, I feel that it would appear that the jury appears to be a fair jury. I will deny your motion."

The above constitutes the extent of the inquiry and pretrial hearing on the issue of the improper use of the State's peremptory challenge to achieve a racially biased jury. Defendant argues that the State failed to explain why the blacks excluded did not fit the profile of the jurors selected and approved by the State. On appeal, the State, conceding the use of its peremptory challenge to exclude 10 blacks from jury duty, has reaffirmed its position by stating in its brief "the People attempted to have a balance of men and women." The State seems to be simply arguing how a jury is selected and defendant is arguing why a jury is selected. The State relies on *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, and contends that defendant may not inquire into a prosecutor's motives in a particular case and the presumption must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury.

This presumption must give way in the light of facts to the contrary as are evident in this case. This court, in a well-reasoned decision, *People v. Payne* (1982), 106 Ill. App. 3d 1034, 436 N.E.2d 1046,[1] recently held that under the sixth amendment,

> "*Swain* does not apply to an accused's right not to have the State affirmatively frustrate his sixth amendment right to a jury drawn from a fair cross section of the community, which is the constitutional issue underlying a decision in this case. We therefore apply *Taylor* and its rationale to this case rather than *Swain*, and we conclude that the sixth amendment precludes the State, *i.e.*, the prosecuting attorney, from affirmatively frustrating the right of the accused to a jury drawn from a fair cross section of the community by utilizing peremptory challenges to exclude blacks from the jury solely because they are blacks." 106 Ill. App. 3d 1034, 1042-43, 436 N.E.2d 1046, 1052.

The *Payne* case goes into great detail to set forth the numerous

---

[1] The opinion in *Payne* was issued subsequent to oral argument in the instant case.

cases wherein this issue has been raised, and this pernicious and systematic practice by the State is made even worse by the frequency of the occurrence.[2] There is little doubt that the State has embraced enthusiastically the results produced by the improper use of the peremptory challenge to achieve a racially biased jury in this case. In fact, this practice was unnecessary and superfluous and resulted in error. The evidence of guilt was so overwhelming that the finding of guilt would probably not have changed even if the composition of the jury had been of the same ethnic group as defendant.

The State also argues that defendant must show the systematic use of peremptory challenges against blacks over a period of time. This argument completely exonerates the State and gives the State the clean hands it claims it so richly deserves. To cast such a burden on defendant denies defendant a fair trial and ascribes good faith efforts to the State despite the presence and existence of the unconstitutional practice of the State of arbitrarily withdrawing the privilege of jury service from black citizens. The practice of the State may appear fair in form, but admittedly has a discriminatory impact and discriminates in its operation.

Any such burden placed on defendant of establishing a *prima facie* case of prosecutorial misconduct would entail proof of a plan conceived or operated as a purposeful devise or technique to further racial discrimination. The precise nature and extent of the evidence necessary to establish such proof or intent would be most difficult, if not impossible, to achieve.

Any burden placed on defendant should not aid the trial court in avoiding its responsibility to a defendant by closing its eyes to obvious practices occurring at trial in open court especially where such practices tend to undermine our traditional guarantee of a fair trial.

In *Commonwealth v. Henderson* (1981), 497 Pa. 23, 438 A.2d 951, Justice Nix stated in his dissent:

> "Is justice to sit supinely by and be flaunted in case after case before a remedy is available? Is justice only obtainable after repeated injustices are demonstrated? Is there any justification within the traditions of the Anglo-Saxon legal philosophy that permits the use of a presumption to hide the existence of an obvious fact?" 497 Pa. 23, 43, 438 A.2d 951, 961.

It would certainly follow in this case that the duty of the court

---

[2]It does not appear that any records or reports are compiled of the disposition of cases pursuant to Supreme Court Rule 23 (85 Ill. 2d R. 23), wherein this issue has been raised, *i.e. People v. Batteast* (1982), 105 Ill. App. 3d 1201.

was clear not to endorse the prosecutor's conduct but to protect the integrity and proper administration of the judicial system. The observation by the court in this case was "that the jury appears to be a fair jury" was clearly an endorsement. The defendant disagreed with a timely objection and with ample justification. A more probing and searching look and a more extensive hearing by the court was needed so that a disproportionate number of challenges were not used to facilitate and justify an invidious discriminatory purpose. See *People v. Payne*; *People v. Wheeler* (1978), 22 Cal. 3d 258, 583 P.2d 748, 148 Cal. Rptr. 890; *Commonwealth v. Soares* (1979), 377 Mass. 593, 387 N.E. 2d 499, *cert. denied* (1979), 444 U.S. 881, 62 L. Ed. 2d 110, 100 S. Ct. 170; see also Annot., *Use of Peremptory Challenges,* 79 A.L.R. 3d 14 (1977).

*Payne* does not call for the abolition of peremptory challenges or to emasculate its function, but seeks to avoid the consequences of a biased jury and a perverted use of said peremptory challenges by the State with the acquiescence of the trial court. The trial court and this court have approved the conduct of the State by finding that no constitutional infirmity existed in the exercise of the State's peremptory challenges to obtain a biased jury. The State is again free to engage in more flagrant abuses as appear from the record in this case.

It may be said in this case that one of the grandest of all abounding illusions may be the illusion possessed by the State that through the use of its 10 peremptory challenges to exclude 10 blacks that the State was only attempting "to have a balance of an equal number of men and women." I remain unconvinced of the State's efforts and view the action as a devise or technique to circumvent the constitutional guarantees of an unbiased jury and a fair trial. I also find that the principles of *Payne, Wheeler* and *Soares* should be controlling in the case at bar and that the application of the standards cited by the State and the majority are misplaced. I would reverse the convictions by reason of the fact that the use of peremptory challenges by the State denied an impartial jury and due process and so tainted or polluted the jury as to require a new trial.