**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190547-U

Order filed March 1, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0547 Circuit No. 17-CF-872 |
| EUGENE LAMAR HAYWOOD, | ) ) ) | Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAUGHERITY delivered the judgment of the court.
Presiding Justice O'Brien and Justice McDade concurred in the judgment.

_____

**ORDER**

¶ 1        *Held*: The circuit court did not abuse its discretion by denying defendant a continuance. Defendant did not receive ineffective assistance of counsel.

¶ 2        Defendant, Eugene Lamar Haywood, appeals his conviction of being an armed habitual criminal. Defendant argues that the Peoria County circuit court abused its discretion by denying him a continuance in order to secure the attendance of a witness. He further argues that counsel provided ineffective assistance by failing to object to other-crimes evidence and failing to submit

a jury instruction telling jurors they may only consider certain evidence as consciousness of guilt evidence. We affirm.

¶ 3                                            I. BACKGROUND

¶ 4        The State charged defendant with being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2016)) and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). The charges stemmed from the shooting of Courtney Jones on August 6, 2017.

¶ 5        On April 10, 2018, defendant disclosed Xariyah Harris as a witness. The disclosure provided an address and phone number for Harris and stated that she was approached by Danaja Dillard, a State's witness who identified defendant as the shooter. Dillard purportedly asked Harris if "Nunu" (defendant) was her cousin and then stated she had not seen Nunu shoot anyone and was not present when Jones was shot. Defendant attempted to have Harris subpoenaed but the subpoena indicates that a deputy was unable to locate her.

¶ 6        On April 16, 2018, the court agreed to the parties' request for a continuance and reset the matter for trial on April 30, 2018. Harris had appeared for trial on April 16 and acknowledged having been subpoenaed. The court admonished her that the case was continued until April 30 and that the "subpoena that required you to be here today also requires as does this court order you to be back on April 30th at 9:00 a.m. Understood and agreed, Ms. Harris?" Harris responded "Yes." The court also stated it would provide Harris with a copy of the order.

¶ 7        On April 30, the court granted the parties' request for a continuance and rescheduled the matter for May 21. Harris did not appear on April 30. Defense counsel did not reference Harris or her failure to appear. However, counsel noted he was attempting to locate Jones and requested an investigator for that purpose. On May 16, counsel requested an investigator to help him

"round up [his] witnesses." At that time, he noted that Harris had been admonished to be present on April 30 but did not come back to court and requested assistance in getting the witnesses.

¶ 8   On May 21, defense counsel requested a continuance in order to secure the attendance of witnesses. Counsel stated that Harris was a rebuttal witness. The court inquired as to what efforts counsel made to secure Harris's attendance. He stated that he was able to contact her on the phone through a third party but was not able to contact her the past weekend. As to subpoena efforts, counsel stated that he did not have an accurate address for Harris. Counsel noted that the court had granted continuances in other matters relating to the attendance of witnesses. The court noted that this was not the first time that counsel was looking for his witnesses and that this had been an ongoing issue. It further noted that, in the other matter referenced by counsel, the State had a potential lead on an address for the person they were looking for but that it did not "hear any such opportunity or hope for finding" Harris for subpoena purposes.

¶ 9   The court denied the continuance but noted that they would be picking the jury that day and not be presenting evidence until the next day. After a recess, counsel indicated that he tried making contact with Harris using a phone number he had previously disclosed but the number was not working. The court stated that it was "not hearing that if the case was continued a week or two weeks that there would be a high probability of confirming that these people will all be here" such that they might have the same problem a week later if it was continued. After all of the trial evidence had been presented, the court further explained its reasoning for denying the continuance. It explained that there was not much more the defense attorney could do to secure the witnesses. It was important that the request was made at the last minute on the day of trial. Further, "that there would be no assurance that any delay in the case, short or long, would *** help in [defense counsel's] efforts." Additionally, there was a minor witness who continually

3

showed up to court and "it was time to put that child's angst out of sight *** once the trial's concluded." The court also noted prior continuances, including at least one at defendant's request. Last, "the overriding concern of how the longer a case drags on the more evidence/witnesses tend to lose memory, go away, lose interest."

¶ 10 At trial, Officer Shannon Parnell testified that he responded to a call of a subject shot. When he arrived, he saw Jones with a bullet wound. Dillard was present when Parnell arrived and he eventually spoke with her. Dillard was on her cell phone and tried to show him something but he did not observe what she was showing him because there was a lot going on. A crowd had gathered and were yelling things such as " 'fuck the police' " and " 'snitches get stitches.' "

¶ 11 Dillard testified that she was 15 years old and Jones was her cousin. She saw Jones get shot. She was just "some feet away" from Jones when he was shot. Dillard saw someone ride up on a bike and shoot. She identified defendant as the shooter. She tried to show an officer a picture on Facebook of defendant with another male.

¶ 12 Queen Hatcher testified that Jones is her nephew and Dillard is her daughter. On April 4, 2018, an individual named Wody came to her apartment. Hatcher stated that "[Wody] said, well I come here to talk about some business to see if we can squash it so your daughter won't testify. He said I have $500. I told him we not money hungry. We don't want your money, and I'm calling the police." When asked what she understood "it" to mean in the phrase "squash it," Hatcher stated that Wody had indicated defendant was his brother, specifically "He said my brother. I came over here to squash this about my brother and your daughter testifying against my brother." Hatcher then told Wody to leave. She left the apartment shortly thereafter. At that time, she saw Wody at the back of her apartment yelling to Dillard that he had $500. She then called Tim Moore, an investigator with the state attorney's office, because he had told her that if

4

they had any problems with anyone coming to Dillard or trying to bribe her to contact him and the police. Hatcher believed the interaction with Wody was related to this case and that the $500 was meant to be in exchange for Dillard not to testify.

¶ 13      An officer testified that on April 4, 2018, defendant had a deposit of $71 into his inmate account. The next transaction on that date was a purchase of $10 for phone time.

¶ 14      Detective Andrew Smith testified that on August 6, 2017, he was called to investigate the shooting of Jones which occurred at approximately 12:30 p.m. that day. He asked Parnell if he had a suspect and Parnell gave him the name Qualin Lewis and a nickname of Nunu. Smith stated that "Nunu was well documented in the Peoria Police Department as being [defendant's] nickname." Smith eventually interviewed defendant and he admitted being at the apartment complex where Jones was shot on the day of the shooting. Defendant told Smith that he picked up his girlfriend, Malika Gillam, from work at 2 p.m.

¶ 15      Smith was notified of a police report that Hatcher made about "Lil' Wody" approaching her on April 4 and offering her $500 for Dillard not to testify against defendant. Smith searched the jail phone calls. Smith was able to locate two recorded phone calls from defendant on April 4 and one from April 5. In one call from April 4, at approximately the same time Hatcher indicated she was approached by Wody, Smith stated that defendant asks the other person, who Smith believes is Wody, what he is doing and that person says, "I'm doing what you need me to do." Additionally, Smith could hear defendant and the other person talking about where the "crib" is. In the second April 4 call, which took place after the time Hatcher said she was approached, Smith testified that defendant is agreeing with comments by the other person that he cannot "demo with her" because she is 15 years old and they need to get her away from her guardian. Smith believed they were referring to Dillard. As to the call on April 5, Smith testified that the

5

person on the phone with defendant is complaining that "the police had been put on them" and that they need to try a different approach. Smith believed that the phone calls fit the scenario that Hatcher reported to the police but admitted on cross-examination that the phone calls lend themselves to different interpretations.

¶ 16        Smith admitted that the first phone call on April 4 does not contain any direct statement about offering a cash bribe or making threats. There was a statement that defendant needed "bread" and that could have simply been that he needed money in his inmate account. Smith admitted that during the second call on April 4, the word "money" was not mentioned and neither were threats. Smith agreed that in the April 5 call, defendant told the person "you probably be doing too much bro" and Smith took that to mean that defendant knew the other person was talking to witnesses on his behalf and was cautioning that they could be going too far. Defense counsel referenced a specific statement by defendant and asked Smith if it was a bribe or threat and Smith said he did not believe it was either, and that he interpreted it as trying to get someone to make a misidentification or take back an identification.

¶ 17        The State entered into evidence certified copies of defendant's convictions for the felony offenses of aggravated unlawful use of a weapon and unlawful use of a weapon by a felon.

¶ 18        Defendant presented two witnesses. Joseph Hall testified that defendant left the apartment complex where the shooting occurred at approximately 11:30 a.m. or 12 p.m. Hall further stated that he witnessed the shooting and the shooter was not defendant, but he could not tell if the shooter was male or female. Gillam testified that defendant was her boyfriend and her child's father. On the day of the shooting, she worked from 8 a.m. to 1 p.m. and defendant picked her up from work.

¶ 19        During closing argument, the State argued that defendant's consciousness of guilt was evidenced by his setting in motion the approach of Hatcher and the offer of $500 for Dillard not to testify. The State did not argue propensity based on that evidence. Defense counsel argued that on the jail phone calls, where defendant talks about money, it was clearly in reference to needing money in his inmate account and noted that defendant specifically stated he could not make calls if he did not have money. Counsel further argued that at no time during the phone calls does defendant ask if money had been offered or make any threats. Additionally, he argued that while Hatcher said someone offered her money, there was no other evidence to corroborate it. Defense counsel also argued that it was not contested that defendant had previous felony weapons convictions but that "[i]t is not in any way, shape, or form to be used to argue or indicate or rationalize that well, if he's previously been convicted of it, it's more likely that he had a gun that day."

¶ 20        The jury found defendant guilty. Posttrial counsel filed a motion for new trial arguing, in part, that the court deprived defendant a fair trial by denying his motion for continuance. The court denied the motion and the matter proceeded to sentencing. The convictions merged and defendant was sentenced to 18 years' imprisonment on the armed habitual criminal conviction. Defendant appeals.

¶ 21                                    II. ANALYSIS

¶ 22                                    A. Continuance

¶ 23        Defendant argues that the court abused its discretion by denying him a continuance in order to secure the attendance at trial of an impeachment witness, Harris.

¶ 24        The decision whether to grant a continuance in order to secure the attendance of a witness at trial "is within the sound discretion of the trial court, and its ruling will not be reversed on

appeal in the absence of a clear abuse of that discretion." *People v. Ward*, 154 Ill. 2d 272, 307 (1992). "The denial of a motion for continuance is not an abuse of discretion where there is no reasonable expectation that the witness will be available in the foreseeable future." *People v. Bramlett*, 276 Ill. App. 3d 201, 205 (1995).

¶ 25 In this matter, Harris had appeared in court on one occasion and was ordered by the court to appear for trial on April 30. Although trial was continued on that date, Harris failed to appear. On the day the trial started, when counsel moved to continue, he indicated that he had not been in contact with Harris directly but only through a third party, and had not been able to contact her that weekend. Further, the phone number he had for Harris was not working and he had never had an accurate address for Harris. Based on the foregoing, we cannot say there was any reasonable expectation that Harris would be available in the foreseeable future and thus, the court did not abuse its discretion by denying defendant a continuance.

¶ 26                                     B. Ineffective Assistance of Counsel

¶ 27 Defendant argues he received ineffective assistance of counsel. Specifically, counsel was ineffective because he failed to: (1) object when Smith testified that defendant's nickname, Nunu, was well documented in the Peoria Police Department, and (2) submit a jury instruction that advised the jurors that evidence regarding other crimes—attempting to bribe Hatcher—could only be considered for the limited purpose of showing consciousness of guilt.

¶ 28 "[T]o prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's substandard representation so prejudiced the defense as to deny the defendant a fair trial." *People v. Horton*, 143 Ill. 2d 11, 23 (1991). "To show actual prejudice, defendant must establish that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

8

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). "The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 377 (2000). " 'Matters of trial strategy are generally immune from claims of ineffective assistance of counsel.' " *People v. Manning*, 241 Ill. 2d 319, 327 (2011) (quoting *People v. Smith*, 195 Ill. 2d 179, 188 (2000)). "As a general rule, trial strategy encompasses decisions such as what matters to object to and when to object." *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991).

¶ 29        First, defendant faults counsel for failing to object to Smith's testimony that it was well documented at the police department that defendant's nickname was Nunu. However, decisions as to what matters to object to are matters of trial strategy and generally immune from claims of ineffective assistance. Here, it would have been a reasonable strategy for counsel to decline to object to this testimony so as not to draw more attention to it. See, *e.g.*, *People v. Evans*, 209 Ill. 2d 194, 221 (2004) (noting in that case that it was "highly possible that defense counsel allowed the statement to pass without objecting to diffuse its importance, rather than object and draw further attention to the statement"). This is especially so because the statement was not substantially prejudicial where it did not contain direct evidence of prior criminality, only speculation. See, *e.g.*, *People v. Banks*, 98 Ill. App. 3d 556, 564 (1981) (finding trial testimony from an investigator that he had previously spoken with defendant during his career did not substantially prejudice defendant because there was no suggestion defendant had committed other crimes). Additionally, the failure to object did not prejudice defendant because there is no reasonable probability that the outcome of the trial would have been different had counsel objected. Notably, two of defendant's prior convictions were properly admitted as substantive

9

evidence and although that was for a limited purpose, those convictions would have more directly indicated to the jury that defendant had prior contact with the police than Smith's statement.

¶ 30     We now turn to counsel's failure to request a limiting jury instruction advising the jury that it could only consider the evidence regarding the bribe as evidence of consciousness of guilt. "It is well settled in Illinois that counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of others, is a matter of trial strategy." *People v. Falco*, 2014 IL App (1st) 111797, ¶ 16. Here, the failure to submit the limiting instruction could be a reasonable trial strategy. This is because defense counsel's cross-examination of Smith and closing arguments attempted to establish that defendant's jail phone calls were open to interpretation and did not implicate him in the attempted bribe of Hatcher. Further, it was clear that defendant was not actively involved in it as he was in jail at the time. Additionally, counsel even argued that the only evidence of the attempted bribe was Hatcher's testimony. Thus, the record indicates that counsel's strategy was to convince the jury that either the attempted bribe did not happen or that there was no evidence defendant was involved, such that he may reasonably have wanted to avoid indicating to the jury through the limiting instruction that the alleged bribe was evidence of other crimes by defendant. See, *e.g.*, *People v. Sizemore*, 226 Ill. App. 3d 956, 959 (1992) (finding that counsel's failure to seek a limiting instruction was a tactical decision which was not subject to second guessing); *People v. Peel*, 2018 IL App (4th) 160100, ¶ 52 (finding that the defendant could not show deficient performance in the tactical decision to decline a limiting instruction and that counsel may have wanted to avoid drawing undue attention to other-crimes evidence).

¶ 31　　　　Additionally, we cannot say that had the jury been given the limiting instruction there is a reasonable probability that the outcome of the trial would have been different. Notably, the State did not improperly argue propensity based upon the bribe and instead properly limited its argument to consciousness of guilt. Thus, we conclude that defendant did not receive ineffective assistance of counsel.

¶ 32　　　　　　　　　　　　　　　　III. CONCLUSION

¶ 33　　　　The judgment of the circuit court of Peoria County is affirmed.

¶ 34　　　　Affirmed.